## ALEXANDER v. GARDNER-DENVER CO.

No. 72–5847.  Argued November 5, 1973—
Decided February 19, 1974

POWELL, J., delivered the opinion for a unanimous Court.

*Paul J. Spiegelman* argued the cause for petitioner. With him on the brief was *Russell Specter*.

*Robert G. Good* argued the cause and filed a brief for respondent.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork, Assistant Attorney General Pottinger, Keith A. Jones, Denis F. Gordon, Eileen M. Stein, Joseph T. Eddins,* and *Beatrice Rosenberg.**

Mr. Justice Powell delivered the opinion of the Court.

This case concerns the proper relationship between federal courts and the grievance-arbitration machinery of collective-bargaining agreements in the resolution and enforcement of an individual's rights to equal employment opportunities under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U. S. C. § 2000e *et seq.* Specifically, we must decide under what circumstances, if any, an employee's statutory right to a trial *de novo* under Title VII may be foreclosed by prior submission of his claim to final arbitration under the nondiscrimination clause of a collective-bargaining agreement.

I

In May 1966, petitioner Harrell Alexander, Sr., a black, was hired by respondent Gardner-Denver Co. (the company) to perform maintenance work at the company's plant in Denver, Colorado. In June 1968, petitioner was awarded a trainee position as a drill operator. He remained at that job until his discharge from employment on September 29, 1969. The company informed petitioner that he was being discharged for producing too many defective or unusable parts that had to be scrapped.

*Briefs of *amici curiae* urging affirmance were filed by *Milton A. Smith* and *Jay S. Siegel* for the Chamber of Commerce of the United States, and by *Gerard C. Smetana, Lawrence M. Cohen,* and *Alan Raywid* for the American Retail Federation.

On October 1, 1969, petitioner filed a grievance under the collective-bargaining agreement in force between the company and petitioner's union, Local No. 3029 of the United Steelworkers of America (the union). The grievance stated: "I feel I have been unjustly discharged and ask that I be reinstated with full seniority and pay." No explicit claim of racial discrimination was made.

Under Art. 4 of the collective-bargaining agreement, the company retained "the right to hire, suspend or discharge [employees] for proper cause."[1] Article 5, § 2, provided, however, that "there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry,"[2] and Art. 23, § 6 (a), stated that "[n]o employee will be discharged, suspended or given a written warning notice except for just cause."

---

[1] Article 4 of the agreement provided:

"MANAGEMENT

"The Union recognizes that all rights to manage the Plant, to determine the products to be manufactured, the methods of manufacturing or assembling, the scheduling of production, the control of raw materials, and to direct the working forces, including the right to hire, suspend or discharge for proper cause, and the right to relieve employees from duty because of lack of work or other legitimate reasons, and the right to maintain order and efficiency are vested exclusively in the Company.

"It is understood by the parties that all rights recognized in this Article are subject to the terms of this Agreement."

[2] Article 5 of the agreement provided:

"MUTUAL RESPONSIBILITY

"*Section 1.* The parties agree that during the term of this Agreement there shall be no strike, slow-down or other interruption of production, and that for the same period there shall be no lockout, subject to the provisions of Article 26, Term of Agreement.

"*Section 2.* The Company and the Union agree that there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry. The Company further states and the Union approves that no such discrimination shall be practiced against any applicant for employment."

The agreement also contained a broad arbitration clause covering "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement" and "any trouble aris[ing] in the plant." [3]   Disputes were to be submitted to a multi-

[3] Article 23, containing the grievance-arbitration procedures of the agreement, provided in relevant part:

.         .         .         .         .

*"Section 5.* Should differences arise between the Company and the Union as to the meaning and application of the provisions of this Agreement, or should any trouble arise in the plant, there shall be no suspension of work, but an earnest effort shall be made by both the Company and the Union to settle such differences promptly. Grievances must be presented within five (5) working days after the date of the occurrence giving rise to the grievance or they shall be considered waived.   Grievances shall be taken up in the following manner; except that any grievance filed by the Local Union shall be submitted in writing at Step 3 of the grievance procedure as set forth herein:

*"Step 1.* An attempt shall first be made by the employee with or without his assistant grievance committeeman (at the employee's option), and the employee's foreman to settle the grievance.   The foreman shall submit his answer within one (1) working day and if the grievance is not settled, it shall be reduced to writing, signed by the employee and his assistant grievance committeeman, and the foreman shall submit his signed answer of such grievance.

*"Step 2.* If the grievance is not settled in Step 1, it shall be presented to the Superintendent, or his representative, within two (2) working days after the Union has received the Foreman's answer in Step 1.   The Superintendent or his representative shall submit his signed answer two (2) working days after receiving the grievance.

*"Step 3.* If the grievance is not settled in Step 2, it shall be presented to the manager of Manufacturing or his representative within five (5) working days after the Union has received the Superintendent's answer in Step 2.   The Manager of Manufacturing or his representative shall meet with the representatives of the Union to attempt to resolve the grievance within five (5) working days following the presentation of the grievance.   The Manager of

step grievance procedure, the first four steps of which involved negotiations between the company and the union. If the dispute remained unresolved, it was to be remitted to compulsory arbitration. The company and the union were to select and pay the arbitrator, and

Manufacturing or his representative shall submit his signed answer within three (3) working days after the date of such meeting.

"*Step 4.* If the grievance is not settled in Step 3, it shall be referred to the Personnel Manager, and/or his representatives, and the International representative and chairman of the grievance committee within five (5) working days after the Union has received the Step 3 answer. Within ten (10) working days after the grievance has been referred to Step 4, the above mentioned parties shall meet for the purpose of discussing such grievance. Within five (5) working days following the meeting, the Company representatives shall submit their signed answer to the Union. The Union representatives shall signify their concurrence or non-concurrence and affix their signatures to the grievance.

"*Step 5.* Grievances which have not been settled under the foregoing procedure may be referred to arbitration by notice in writing within ten (10) calendar days after the date of the Company's final answer in Step 4. Within five (5) days after receipt of referral to arbitration the parties shall select an impartial arbitrator.

. "Should the parties be unable to agree upon an arbitrator, the selection shall be made by the Senior Judge of the U. S. Circuit Court of Appeals for the Tenth Circuit. The decision of the arbitrator shall be final and binding upon the Company, the Union, and any employee or employees involved. The expenses and fee of the arbitrator shall be divided equally between the Company and the Union. The arbitrator shall not amend, take away, add to, or change any of the provisions of this Agreement, and the arbitrator's decision must be based solely upon an interpretation of the provisions of this Agreement.

"*Section 6.* (a) No employee will be discharged, suspended or given a written warning notice except for just cause.

. . . . .

"(g) Should it be determined that the employee has been unjustly suspended or discharged the Company shall reinstate the employee and pay full compensation at the employee's basic hourly rate or earned rate, whichever is the higher, for the time lost."

his decision was to be "final and binding upon the Company, the Union, and any employee or employees involved." The agreement further provided that "[t]he arbitrator shall not amend, take away, add to, or change any of the provisions of this Agreement, and the arbitrator's decision must be based solely upon an interpretation of the provisions of this Agreement." The parties also agreed that there "shall be no suspension of work" over disputes covered by the grievance-arbitration clause.

The union processed petitioner's grievance through the above machinery. In the final pre-arbitration step, petitioner raised, apparently for the first time, the claim that his discharge resulted from racial discrimination. The company rejected all of petitioner's claims, and the grievance proceeded to arbitration. Prior to the arbitration hearing, however, petitioner filed a charge of racial discrimination with the Colorado Civil Rights Commission, which referred the complaint to the Equal Employment Opportunity Commission on November 5, 1969.

At the arbitration hearing on November 20, 1969, petitioner testified that his discharge was the result of racial discrimination and informed the arbitrator that he had filed a charge with the Colorado Commission because he "could not rely on the union." The union introduced a letter in which petitioner stated that he was "knowledgeable that in the same plant others have scrapped an equal amount and sometimes in excess, but by all logical reasoning I . . . have been the target of preferential discriminatory treatment." The union representative also testified that the company's usual practice was to transfer unsatisfactory trainee drill operators back to their former positions.

On December 30, 1969, the arbitrator ruled that petitioner had been "discharged for just cause." He made no reference to petitioner's claim of racial discrimination.

The arbitrator stated that the union had failed to produce evidence of a practice of transferring rather than discharging trainee drill operators who accumulated excessive scrap, but he suggested that the company and the union confer on whether such an arrangement was feasible in the present case.

On July 25, 1970, the Equal Employment Opportunity Commission determined that there was not reasonable cause to believe that a violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* had occurred. The Commission later notified petitioner of his right to institute a civil action in federal court within 30 days. Petitioner then filed the present action in the United States District Court for the District of Colorado, alleging that his discharge resulted from a racially discriminatory employment practice in violation of § 703 (a) (1) of the Act, 42 U. S. C. § 2000e–2 (a)(1).

The District Court granted respondent's motion for summary judgment and dismissed the action. 346 F. Supp. 1012 (1971). The court found that the claim of racial discrimination had been submitted to the arbitrator and resolved adversely to petitioner.[4] It then held that petitioner, having voluntarily elected to pursue his grievance to final arbitration under the nondiscrimination clause of the collective-bargaining agreement, was bound by the arbitral decision and thereby precluded from suing his employer under Title VII. The Court of Appeals for the Tenth Circuit affirmed *per curiam* on the basis of the District Court's opinion. 466 F. 2d 1209 (1972).

We granted petitioner's application for certiorari. 410 U. S. 925 (1973). We reverse.

---

[4] In reaching this conclusion, the District Court relied on petitioner's deposition acknowledging that he had raised the racial discrimination claim during the arbitration hearing. 346 F. Supp., at 1014.

## II

Congress enacted Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin. *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 800 (1973); *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 429–430 (1971). Cooperation and voluntary compliance were selected as the preferred means for achieving this goal. To this end, Congress created the Equal Employment Opportunity Commission and established a procedure whereby existing state and local equal employment opportunity agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit. In the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103, Congress amended Title VII to provide the Commission with further authority to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of Title VII, and to institute civil actions against employers or unions named in a discrimination charge.

Even in its amended form, however, Title VII does not provide the Commission with direct powers of enforcement. The Commission cannot adjudicate claims or impose administrative sanctions. Rather, final responsibility for enforcement of Title VII is vested with federal courts. The Act authorizes courts to issue injunctive relief and to order such affirmative action as may be appropriate to remedy the effects of unlawful employment practices. 42 U. S. C. §§ 2000e–5 (f) and (g) (1970 ed., Supp. II). Courts retain these broad remedial powers despite a Commission finding of no reasonable cause to believe that the Act has been violated. *Mc-*

*Donnell Douglas Corp.* v. *Green, supra,* at 798–799. Taken together, these provisions make plain that federal courts have been assigned plenary powers to secure compliance with Title VII.

In addition to reposing ultimate authority in federal courts, Congress gave private individuals a significant role in the enforcement process of Title VII. Individual grievants usually initiate the Commission's investigatory and conciliatory procedures. And ˋalthough the 1972 amendment to Title VII empowers the Commission to bring its own actions, the private right of action remains an essential means of obtaining judicial enforcement of Title VII. 42 U. S. C. § 2000e–5 (f) (1) (1970 ed., Supp. II). In such cases, the private litigant not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices. *Hutchings* v. *United States Industries,* 428 F. 2d 303, 310 (CA5 1970); *Bowe* v. *Colgate-Palmolive Co.,* 416 F. 2d 711, 715 (CA7 1969); *Jenkins* v. *United Gas Corp.,* 400 F. 2d 28, 33 (CA5 1968). See also *Newman* v. *Piggie Park Enterprises,* 390 U. S. 400, 402 (1968).

Pursuant to this statutory scheme, petitioner initiated the present action for judicial consideration of his rights under Title VII. The District Court and the Court of Appeals held, however, that petitioner was bound by the prior arbitral decision and had no right to sue under Title VII.[5] Both courts evidently thought that this result was

_____

[5] The District Court recognized that a conflict of authorities existed on this issue but chose to rely on *Dewey* v. *Reynolds Metals Co.,* 429 F. 2d 324, 332 (CA6 1970), affirmed by an equally divided Court, 402 U. S. 689 (1971). There, the Sixth Circuit held that prior submission of an employee's claim to arbitration under a collective-bargaining agreement precluded a later suit under Title VII. The Sixth Circuit appears to have since retreated in part from *Dewey* by suggesting that there is no preclusion where both arbitration and "court or agency processes" are pursued simultaneously. See *Spann* v. *Kaywood Division, Joanna Western Mills Co.,* 446 F. 2d

dictated by notions of election of remedies and waiver and by the federal policy favoring arbitration of labor disputes, as enunciated by this Court in *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448 (1957), and the *Steelworkers* trilogy.[6]   See also *Boys Markets* v.

---

120, 122 (1971). The Fifth, Seventh, and Ninth Circuits have squarely rejected a preclusion rule. See *Hutchings* v. *United States Industries,* 428 F. 2d 303 (CA5 1970); *Bowe* v. *Colgate-Palmolive Co.,* 416 F. 2d 711 (CA7 1969); *Oubichon* v. *North American Rockwell Corp.,* 482 F. 2d 569 (CA9 1973).

[6] *United Steelworkers of America* v. *American Mfg. Co.,* 363 U. S. 564 (1960); *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574 (1960); *United Steelworkers of America* v. *Enterprise Wheel & Car . Corp.,* 363 U. S. 593 (1960). In *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448 (1957), this Court held that a grievance-arbitration provision of a collective-bargaining agreement could be enforced against unions and employers under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185. The Court noted that the congressional policy, as embodied in § 203 (d) of the LMRA, 61 Stat. 154, 29 U. S. C. § 173 (d), was to promote industrial peace and that the grievance-arbitration provision of a collective agreement was a major factor in achieving this goal. 353 U. S., at 455. In the *Steelworkers* trilogy, the Court further advanced this policy by declaring that an order to arbitrate will not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America* v. *Warrior & Gulf Navigation Co., supra,* at 582–583. The Court also stated that "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America* v. *Enterprise Wheel & Car Corp., supra,* at 599. And in *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965), the Court held that grievance-arbitration procedures of a collective-bargaining agreement must be exhausted before an employee may file suit to enforce contractual rights.

For the reasons stated in Parts III, IV, and V of this opinion, we hold that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a contractual claim is dispositive of a statutory claim under Title VII.

*Retail Clerks Union,* 398 U. S. 235 (1970); *Gateway Coal Co.* v. *United Mine Workers of America,* 414 U. S. 368 (1974). We disagree.

### III

Title VII does not speak expressly to the relationship between federal courts and the grievance-arbitration machinery of collective-bargaining agreements. It does, however, vest federal courts with plenary powers to enforce the statutory requirements; and it specifies with precision the jurisdictional prerequisites that an individual must satisfy before he is entitled to institute a lawsuit. In the present case, these prerequisites were met when petitioner (1) filed timely a charge of employment discrimination with the Commission, and (2) received and acted upon the Commission's statutory notice of the right to sue. 42 U. S. C. §§ 2000e-5 (b), (e), and (f). See *McDonnell Douglas Corp.* v. *Green, supra,* at 798. There is no suggestion in the statutory scheme that a prior arbitral decision either forecloses an individual's right to sue or divests federal courts of jurisdiction.

In addition, legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination.[7] In the Civil Rights Act of 1964, 42 U. S. C. § 2000a *et seq.,* Congress indicated that it considered the policy against discrimination to be of the "highest priority." *Newman* v. *Piggie Park Enterprises, supra,* at 402. Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. See 42 U. S. C. § 2000e-5 (b) (1970 ed., Supp. II) (EEOC); 42 U. S C. § 2000e-5 (c) (1970 ed., Supp. II) (state and local agencies); 42 U. S. C. § 2000e-5 (f) (1970 ed., Supp. II) (federal courts). And, in general, submission of a

---

[7] See, *e. g.,* 42 U. S. C. § 1981 (Civil Rights Act of 1866); 42 U. S. C. § 1983 (Civil Rights Act of 1871).

claim to one forum does not preclude a later submission to another.[8]  Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.[9]  The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions re-

---

[8] For example, Commission action is not barred by "findings and orders" of state or local agencies.  See 42 U. S. C. § 2000e–5 (b) (1970 ed., Supp. II).  Similarly, an individual's cause of action is not barred by a Commission finding of no reasonable cause to believe that the Act has been violated.  See 42 U. S. C. § 2000e–5 (f) (1970 ed., Supp. II); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973).

[9] For example, Senator Joseph Clark, one of the sponsors of the bill, introduced an interpretive memorandum which stated: "Nothing in title VII or anywhere else in this bill affects rights and obligations under the NLRA and the Railway Labor Act. . . . [T]itle VII is not intended to and does not deny to any individual, rights and remedies which he may pursue under other Federal and State statutes.  If a given action should violate both title VII and the National Labor Relations Act, the National Labor Relations Board would not be deprived of jurisdiction."  110 Cong. Rec. 7207 (1964). Moreover, the Senate defeated an amendment which would have made Title VII the exclusive federal remedy for most unlawful employment practices.  110 Cong. Rec. 13650–13652 (1964).  And a similar amendment was rejected in connection with the Equal Employment Opportunity Act of 1972.  See H. R. 9247, 92d Cong., 1st Sess. (1971); H. R. Rep. No. 92–238 (1971).  See also 2 U. S. Code Cong. & Ad. News, 92d Cong., 2d Sess., 2137, 2179, 2181– 2182 (1972).  The report of the Senate Committee responsible for the 1972 Act explained that neither the "provisions regarding the individual's right to sue under title VII, nor any of the other provisions of this bill, are meant to affect existing rights granted under other laws."  S. Rep. No. 92–415, p. 24 (1971).  For a detailed discussion of the legislative history of the 1972 Act, see Sape & Hart, Title VII Reconsidered: The Equal Opportunity Act of 1972, 40 Geo. Wash. L. Rev. 824 (1972).

lating to employment discrimination. In sum, Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement.

In reaching the opposite conclusion, the District Court relied in part on the doctrine of election of remedies.[10] That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent,[11] has no application in the present context. In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statu-

---

[10] The District Court adopted the reasoning of the Sixth Circuit in *Dewey* v. *Reynolds Metals Co.*, 429 F. 2d, at 332, affirmed by an equally divided Court, 402 U. S. 689 (1971), which was apparently based in part on the doctrine of election of remedies. See n. 5, *supra*. The Sixth Circuit, however, later described *Dewey* as resting instead on the doctrine of equitable estoppel and on "themes of res judicata and collateral estoppel." *Newman* v. *Avco Corp.*, 451 F. 2d 743, 747 n. 1 (1971). Whatever doctrinal label is used, the essence of these holdings remains the same. The policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are equally applicable to the doctrines of *res judicata* and collateral estoppel.

[11] See generally 5A A. Corbin, Contracts §§ 1214–1227 (1964 ed. and Supp. 1971). Most courts have recognized that the doctrine of election of remedies does not apply to suits under Title VII. See, *e. g., Bowe* v. *Colgate-Palmolive Co.*, 416 F. 2d, at 714–715; *Hutchings* v. *United States Industries*, 428 F. 2d, at 314; *Macklin* v. *Spector Freight Systems*, 156 U. S. App. D. C. 69, 80–81, 478 F. 2d 979, 990–991 (1973); *Voutsis* v. *Union Carbide Corp.*, 452 F. 2d 889, 893–894 (CA2 1971), cert. denied, 406 U. S. 918 (1972); *Newman* v. *Avco Corp., supra,* at 746 n. 1; *Oubichon* v. *North American Rockwell Corp.*, 482 F. 2d, at 572–573.

tory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums. The resulting scheme is somewhat analogous to the procedure under the National Labor Relations Act, as amended,[12] where disputed transactions may implicate both contractual and statutory rights. Where the statutory right underlying a particular claim may not be abridged by contractual agreement, the Court has recognized that consideration of the claim by the arbitrator as a contractual dispute under the collective-bargaining agreement does not preclude subsequent consideration of the claim by the National Labor Relations Board as an unfair labor practice charge or as a petition for clarification of the union's representation certificate under the Act. *Carey* v. *Westinghouse Corp.*, 375 U. S. 261 (1964).[13] Cf. *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962). There, as here, the relationship between the forums is complementary since consideration of the claim by both forums may promote the policies under-

---

[12] 61 Stat. 136, 29 U. S. C. § 151 *et seq.*

[13] As the Court noted in *Carey*:

"By allowing the dispute to go to arbitration . . . those conciliatory measures which Congress deemed vital to 'industrial peace' . . . and which may be dispositive of the entire dispute, are encouraged. The superior authority of the Board may be invoked at any time. Meanwhile the therapy of arbitration is brought to bear in a complicated and troubled area." 375 U. S., at 272.

Should disagreements arise between the Board and the arbitrator, the Board's ruling would, of course, take precedence as to those issues within its jurisdiction. *Ibid.*

lying each. Thus, the rationale behind the election-of-remedies doctrine cannot support the decision below.[14]

We are also unable to accept the proposition that petitioner waived his cause of action under Title VII. To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII. It is true, of course, that a union may waive certain statutory rights related to collective activity, such as the right to strike. *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270 (1956); *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235 (1970). These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of

---

[14] Nor can it be maintained that election of remedies is required by the possibility of unjust enrichment through duplicative recoveries. Where, as here, the employer has prevailed at arbitration, there, of course, can be no duplicative recovery. But even in cases where the employee has first prevailed, judicial relief can be structured to avoid such windfall gains. See, *e. g., Oubichon* v. *North American Rockwell Corp., supra; Bowe* v. *Colgate-Palmolive Co., supra.* Furthermore, if the relief obtained by the employee at arbitration were fully equivalent to that obtainable under Title VII, there would be no further relief for the court to grant and hence no need for the employee to institute suit.

prospective waiver. See *Wilko* v. *Swan,* 346 U. S. 427 (1953).

The actual submission of petitioner's grievance to arbitration in the present case does not alter the situation. Although presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement,[15] mere resort to the arbitral forum to enforce contractual rights constitutes no such waiver. Since an employee's rights under Title VII may not be waived prospectively, existing contractual rights and remedies against discrimination must result from other concessions already made by the union as part of the economic bargain struck with the employer. It is settled law that no additional concession may be exacted from any employee as the price for enforcing those rights. *J. I. Case Co.* v. *NLRB,* 321 U. S. 332, 338–339 (1944).

Moreover, a contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination. Both rights have legally independent origins and are equally available to the aggrieved employee. This point becomes apparent through consideration of the role of the arbitrator in the system of industrial self-government.[16]

---

[15] In this case petitioner and respondent did not enter into a voluntary settlement expressly conditioned on a waiver of petitioner's cause of action under Title VII. In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing. In no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's rights under Title VII.

[16] See Meltzer, Labor Arbitration and Overlapping and Conflicting Remedies for Employment Discrimination, 39 U. Chi. L. Rev. 30, 32–35 (1971); Meltzer, Ruminations About Ideology, Law, and

As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the "industrial common law of the shop" and the various needs and desires of the parties. The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties:

> "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 597 (1960).

If an arbitral decision is based "solely upon the arbitrator's view of the requirements of enacted legislation," rather than on an interpretation of the collective-bargaining agreement, the arbitrator has "exceeded the scope of the submission," and the award will not be enforced. *Ibid*. Thus the arbitrator has authority to resolve only ques-

---

Labor Arbitration, 34 U. Chi. L. Rev. 545 (1967). As the late Dean Shulman stated:

"A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties. He serves their pleasure only, to administer the rule of law established by their collective agreement." Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv. L. Rev. 999, 1016 (1955).

tions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.

## IV

The District Court and the Court of Appeals reasoned that to permit an employee to have his claim considered in both the arbitral and judicial forums would be unfair since this would mean that the employer, but not the employee, was bound by the arbitral award. In the District Court's words, it could not "accept a philosophy which gives the employee two strings to his bow when the employer has only one." 346 F. Supp., at 1019. This argument mistakes the effect of Title VII. Under the *Steelworkers* trilogy, an arbitral decision is final and binding on the employer and employee, and judicial review is limited as to both. But in instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process. An employer does not have "two strings to his bow" with respect to an arbitral decision for the simple reason that Title VII does not provide employers with a cause of action against employees. An employer cannot be the victim of discriminatory employment practices. *Oubichon* v. *North American Rockwell Corp.*, 482 F. 2d 569, 573 (CA9 1973).

The District Court and the Court of Appeals also thought that to permit a later resort to the judicial forum would undermine substantially the employer's incentive to arbitrate and would "sound the death knell for arbitration clauses in labor contracts." 346 F. Supp., at 1019. Again, we disagree. The primary incentive for an employer to enter into an arbitration agreement is the union's reciprocal promise not to strike. As the

Court stated in *Boys Markets* v. *Retail Clerks Union*, 398 U. S., at 248, "a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." It is not unreasonable to assume that most employers will regard the benefits derived from a no-strike pledge as outweighing whatever costs may result from according employees an arbitral remedy · against discrimination in addition to their judicial remedy under Title VII. Indeed, the severe consequences of a strike may make an arbitration clause almost essential from both the employees' and the employer's perspective. Moreover, the grievance-arbitration machinery of the collective-bargaining agreement remains a relatively inexpensive and expeditious means for resolving a wide range of disputes, including claims of discriminatory employment practices. Where the collective-bargaining agreement contains a nondiscrimination clause similar to Title VII, and where arbitral procedures are fair and regular, arbitration may well produce a settlement satisfactory to both employer and employee. An employer thus has an incentive to make available the conciliatory and therapeutic processes of arbitration which may satisfy an employee's perceived need to resort to the judicial forum, thus saving the employer the expense and aggravation associated with a lawsuit. For similar reasons, the employee also has a strong incentive to arbitrate grievances, and arbitration may often eliminate those misunderstandings or discriminatory practices that might otherwise precipitate resort to the judicial forum.

## V

Respondent contends that even if a preclusion rule is not adopted, federal courts should defer to arbitral decisions on discrimination claims where: (i) the claim

was before the arbitrator; (ii) the collective-bargaining agreement prohibited the form of discrimination charged in the suit under Title VII; and (iii) the arbitrator has authority to rule on the claim and to fashion a remedy.[17] Under respondent's proposed rule, a court would grant summary judgment and dismiss the employee's action if the above conditions were met. The rule's obvious consequence in the present case would be to deprive the petitioner of his statutory right to attempt to establish his claim in a federal court.

At the outset, it is apparent that a deferral rule would be subject to many of the objections applicable to a preclusion rule. The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal. Furthermore, we have long recognized that "the choice of forums inevitably affects the scope of the substantive right to be vindicated." *U. S. Bulk Carriers* v. *Arguelles,* 400 U. S. 351, 359–360 (1971) (Harlan, J., concurring). Respondent's deferral rule is necessarily premised on the assumption that arbitral processes are commensurate with judicial processes and that Congress impliedly intended federal courts to defer to arbitral decisions on Title VII issues. We deem this supposition unlikely.

Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the

---

[17] Brief for Respondent 37. Respondent's proposed rule is analogous to the NLRB's policy of deferring to arbitral decisions on statutory issues in certain cases. See *Spielberg Mfg. Co.,* 112 N. L. R. B. 1080, 1082 (1955).

requirements of enacted legislation. Where the collective-bargaining agreement conflicts with Title VII, the arbitrator must follow the agreement. To be sure, the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII. But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 581–583 (1960).[18] Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts.

Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under

---

[18] See also Gould, Labor Arbitration of Grievances Involving Racial Discrimination, 118 U. Pa. L. Rev. 40, 47–48 (1969); Platt, The Relationship between Arbitration and Title VII of the Civil Rights Act of 1964, 3 Ga. L. Rev. 398 (1969). Significantly, a substantial proportion of labor arbitrators are not lawyers. See Note, The NLRB and Deference to Arbitration, 77 Yale L. J. 1191, 1194 n. 28 (1968). This is not to suggest, of course, that arbitrators do not possess a high degree of competence with respect to the vital role in implementing the federal policy favoring arbitration of labor disputes.

oath, are often severely limited or unavailable. See *Bernhardt* v. *Polygraphic Co.,* 350 U. S. 198, 203 (1956); *Wilko* v. *Swan,* 346 U. S., at 435–437. And as this Court has recognized, "[a]rbitrators have no obligation to the court to give their reasons for an award." *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.,* 363 U. S., at 598. Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts.[19]

It is evident that respondent's proposed rule would not allay these concerns. Nor are we convinced that the solution lies in applying a more demanding deferral standard, such as that adopted by the Fifth Circuit in *Rios* v. *Reynolds Metals Co.,* 467 F. 2d 54 (1972).[20] As

---

[19] A further concern is the union's exclusive control over the manner and extent to which an individual grievance is presented. See *Vaca* v. *Sipes,* 386 U. S. 171 (1967); *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965). In arbitration, as in the collective-bargaining process, the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit. See *J. I. Case Co.* v. *NLRB,* 321 U. S. 332 (1944). Moreover, harmony of interest between the union and the individual employee cannot always be presumed, especially where a claim of racial discrimination is made. See, *e. g., Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192 (1944); *Tunstall* v. *Brotherhood of Locomotive Firemen,* 323 U. S. 210 (1944). And a breach of the union's duty of fair representation may prove difficult to establish. See *Vaca* v. *Sipes, supra; Humphrey* v. *Moore,* 375 U. S. 335, 342, 348–351 (1964). In this respect, it is noteworthy that Congress thought it necessary to afford the protections of Title VII against unions as well as employers. See 42 U. S. C. § 2000e–2 (c).

[20] In *Rios,* the court set forth the following deferral standard: "First, there may be no deference to the decision of the arbitrator unless the contractual right coincides with rights under Title VII. Second, it must be plain that the arbitrator's decision is in no way

respondent points out, a standard that adequately insured effectuation of Title VII rights in the arbitral forum would tend to make arbitration a procedurally complex, expensive, and time-consuming process. And judicial enforcement of such a standard would almost require courts to make *de novo* determinations of the employees' claims. It is uncertain whether any minimal savings in judicial time and expense would justify the risk to vindication of Title VII rights.

A deferral rule also might adversely affect the arbitration system as well as the enforcement scheme of Title VII. Fearing that the arbitral forum cannot adequately protect their rights under Title VII, some employees may elect to bypass arbitration and institute a lawsuit. The possibility of voluntary compliance or settlement of Title VII claims would thus be reduced, and the result could well be more litigation, not less.

We think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause

---

violative of the private rights guaranteed by Title VII, nor of the public policy which inheres in Title VII. In addition, before deferring, the district court must be satisfied that (1) the factual issues before it are identical to those decided by the arbitrator; (2) the arbitrator had power under the collective agreement to decide the ultimate issue of discrimination; (3) the evidence presented at the arbitral hearing dealt adequately with all factual issues; (4) the arbitrator actually decided the factual issues presented to the court; (5) the arbitration proceeding was fair and regular and free of procedural infirmities. The burden of proof in establishing these conditions of limitation will be upon the respondent as distinguished from the claimant." 467 F. 2d, at 58. For a discussion of the problems posed by application of the *Rios* standard, see Note, Judicial Deference to Arbitrators' Decisions in Title VII Cases, 26 Stan. L. Rev. 421 (1974).

of a collective-bargaining agreement and his cause of action under Title VII. The federal court should consider the employee's claim *de novo*. The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.[21]

The judgment of the Court of Appeals is

*Reversed.*

---

[21] We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum.