In the

# United States Court of Appeals

### For the Seventh Circuit

No. 18-1591

AMEREN ILLINOIS COMPANY,

*Plaintiff-Appellee,*

*v.*

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION 51,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:17-cv-03163 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 5, 2018 — DECIDED OCTOBER 12, 2018

Before KANNE, SYKES, and ST. EVE, *Circuit Judges.*

KANNE, *Circuit Judge.* Brian Knox got into a heated argument with his supervisor at work. He allegedly made threatening remarks and was known to carry a concealed weapon either on his person or in his personal vehicle, which was parked in the company parking lot. In response, his employer terminated him for violating its Workplace Violence Policy.

Through his union, Knox brought a grievance under the collective bargaining agreement ("CBA") then in force, and the parties opted for binding arbitration. The arbitrator determined that although Knox had technically violated the policy, the employer could not enforce the rule because it violated an Illinois statute. The arbitrator ordered Knox's reinstatement, and the employer sought review by the federal district court and obtained a judicial order vacating the award on the ground that the arbitrator improperly applied external law to contradict the terms of the CBA. Because we believe that the text of the CBA permitted the arbitrator to look to external law in interpreting the agreement, we reverse the judgment of the district court and uphold the arbitrator's award.

## I. BACKGROUND

Ameren Illinois Company operates a facility in Galesburg, Illinois. Ameren employed Knox at the facility beginning in 1998 and made him a crew leader in 2015. On June 3, 2016, Knox had a series of heated arguments with his supervisor Gabriel Jones over the scheduling of work. Other employees later indicated to Jones that Knox owned several firearms and was known to carry concealed weapons on a regular basis. On June 6, representatives of the company confronted Knox in the presence of a union representative and a deputy sheriff. They requested Knox's consent to search both his person and his vehicle for weapons. He consented, and the search uncovered a firearm in Knox's truck (then parked in the company's parking lot).

On June 27, Ameren notified Knox of his termination for violations of the company's Workplace Violence Policy, which expressly prohibits threatening or intimidating an-

other employee and "the possession of unauthorized weapons by any employee … on Company parking lots." (R. 1-3 at 2–3.)

The following day, the union filed a grievance on Knox's behalf to protest his termination. After the parties failed to resolve the dispute among themselves, they submitted the case to binding arbitration. The parties certified the following question to the arbitrator: "Was the termination of the Grievant on or about June 27, 2016 for just cause; and if not, what is the appropriate remedy?" (R. 1-3 at 1.) According to the CBA, "[t]he arbitrator's decision [is] final and binding on all parties." (R. 1-1 at 6.) But the agreement also adds a jurisdictional caveat: "In considering any dispute under this provision, the arbitrator [has] no authority to amend, delete from or add to this agreement." *Id.*

Arbitrator George R. Fleischli conducted a hearing on March 24, 2017, and delivered his award on July 8. Finding that the company did not have just cause to terminate Knox, he reversed the company's action on two separate grounds. First, he disagreed with the company's allegations that Knox's remarks to Jones rose to the level of threats or intimidation and instead found that the statements were merely "a clear affront to [Jones'] authority." (R. 1-3 at 40–41.) While serious enough to warrant discipline, Fleischli did not believe that the comments violated the policy or merited termination.

Second, and most notable for the case before us today, Fleischli found that Knox had, in fact, violated the policy by storing a firearm in his personal vehicle. However, he determined that the policy was unenforceable because Knox possessed a valid license to carry the weapon under the Illinois

Concealed Carry Act, 430 ILCS 66/1 *et seq*. That statute expressly permitted Knox to store his firearm in his vehicle on private property unless the owner posted a sign "indicating that firearms are prohibited on the property." *Id.* at § 65(a-10). Because the company had no such sign posted, the arbitrator found that the law "serve[d] to prohibit the Employer from enforcing its rule in the Grievant's case, because he [was] in possession of a concealed carry license." (R. 1-3 at 44.)

Ameren immediately brought suit to vacate Fleischli's award. The district court, finding that the arbitrator improperly applied external public law to contradict the bargain between the parties, granted summary judgment to Ameren and vacated the award. *See Ameren Ill. Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 51*, No. 3:17-cv-03163, 2018 WL 1244149 (C.D. Ill. Mar. 9, 2018).

## II. ANALYSIS

We review the district court's decision to grant summary judgment and vacate the arbitrator's award *de novo*. *See Amax Coal Co. v. United Mine Workers of Am., Int'l Union*, 92 F.3d 571, 574 (7th Cir. 1996).

A court's role in reviewing a labor arbitration award is "very limited." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960). "The courts … have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Id.* at 568. "As long as the arbitrator's award 'draws its essence from the [CBA],' and is not merely 'his own brand of industrial justice,' the award is legitimate." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36

(1987) (quoting *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (1960)). "When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly factfinding' does not provide a basis for a reviewing court to refuse to enforce the award.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Misco*, 484 U.S. at 39). "Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Misco*, 484 U.S. at 38.

This extraordinarily deferential standard of review is grounded in courts' respect for the role of the labor arbitrator in administering "a system of industrial self-government." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580 (1960). This analogy, which the Supreme Court adopted in its seminal *Steelworkers* Trilogy of cases in 1960, conceives of the CBA as more akin to a private constitution than a mere contract. *Id.* at 580–582. In that system, the arbitrator "is not a public tribunal imposed upon the parties by superior authority," but is instead "usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment." *Id.* at 581–82. "The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, [and] his judgment whether tensions will be heightened or diminished." *Id.* at 582. "The ablest judge cannot be expected to bring the same experience and competence

to bear upon the determination of a grievance, because he cannot be similarly informed." *Id*. To find otherwise would mean that "arbitration would just be the first of a series of steps that always culminate[s] in court litigation, and it would lose its *raison d'être*." *Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 336 F.3d 629, 632 (7th Cir. 2003).

But that does not mean that courts have no role in reviewing the results of labor arbitration. Section 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185, grants to federal courts jurisdiction to determine, among other questions, whether the arbitrator "exceeded the scope of his submission." *Enterprise Wheel*, 363 U.S. at 597.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.*

The Supreme Court elaborated on that guidance in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974). It held that the arbitration of a grievant's claim of racial discrimination against his employer did not preclude a separate suit in federal court under Title VII. To that end, the Court observed that "the arbitrator has authority to resolve only questions of contractual rights." *Id.* at 53–54. It reiterated that "the arbitrator's task is to effectuate the intent of the parties." *Id.* at 53. "His

source of authority is the [CBA]," and he "has no general authority to invoke public laws that conflict with the bargain between the parties." *Id.* Thus, "[i]f an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on the interpretation of the [CBA], the arbitrator has 'exceeded the scope of the submission.'" *Id.* (quoting *Enterprise Wheel*, 363 U.S. at 597). In other words, "[i]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract … that the award can be said not to 'draw its essence from the [CBA].'" *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292 (7th Cir. 1996) (quoting *Ethyl Corp. v. United Steelworkers of Am., AFL-CIO-CLC*, 768 F.2d 180, 184–85 (7th Cir. 1985)).

We interpreted the language from *Gardner–Denver* in *Roadmaster Corp. v. Prod. and Maint. Emp. Local 504, Laborers' Int'l Union of N. Am., AFL-CIO*, 851 F.2d 886 (7th Cir. 1988). In *Roadmaster*, a labor arbitrator declined to enforce a straightforward provision of the CBA because he believed that it contradicted § 8(d)(2) of the National Labor Relations Act. We invalidated the award, establishing a bright-line rule for the future labor arbitration and the consideration of contrary positive law: "When a contract … specifically limits an arbitrator's subject matter jurisdiction, the arbitrator should restrict his consideration to the contract, even if such a decision conflicts with … statutory law." *Id.* at 889.

But in other cases, we have found that references to external law were not so clear as to defeat the deference we have traditionally accorded to labor arbitrators. In *Butler*, an arbitrator determined that some of the grievant's unauthorized

absences had been protected under the Family and Medical
Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.*, and were
therefore not properly the subject of disciplinary procedures
against her. 336 F.3d at 629. The company challenged the ap-
plication of external law, but we upheld the arbitrator's
award. We determined that language in the CBA guarantee-
ing "equal opportunity for employment, advancement in em-
ployment, and continuation of employment to all qualified in-
dividuals *in accordance with the provisions of law*" was sufficient
to incorporate the FMLA into the agreement and therefore
within the scope of the arbitrator's task. *Id.* at 633 (emphasis
added).

*Roadmaster* and *Butler* are not in conflict with one another.
They both recognize the difficult tasks that courts face when
wading into the field of labor arbitration. "[J]udicial interven-
tion is ill-suited to the special characteristics of the arbitration
process in labor disputes." *Textile Workers Union of Am. v. Lin-
coln Mills of Ala.*, 353 U.S. 448, 463 (1957) (Frankfurter, J., dis-
senting).

> [A]rbitration is an integral part of the system of [in-
> dustrial] self-government. … It is only when the sys-
> tem breaks down completely that the courts' aid in
> these respects is invoked. But the courts cannot, by
> occasional sporadic decision, restore the parties'
> continuing relationship; and their intervention in
> such cases may seriously affect the going systems of
> self-government.

*Id.* (quoting Harry Shulman, *Reason, Contract, and Law in Labor
Relations*, 68 Harv. L. Rev. 999, 1024 (1955)).

For that reason, courts hesitate to set aside an arbitrator's award so long as it "draws its essence from the collective bargaining agreement." *Enterprise Wheel*, 363 U.S. at 597. An arbitrator who decides disputes on the basis of statute rather than "the industrial common law of the shop" merely substitutes himself for courts. *Id.* In that case, a judge has no reason to defer to the arbitrator's specialized knowledge of industry because a judge is better suited to interpreting and applying public law.

The trouble arises, however, when the arbitrator's reasoning is unclear. As we noted in *Butler*, "[a]rbitrators are normally not required to write any opinion at all, and it is worth reiterating that a court's review of an arbitral award does not proceed under the sample principles that would apply if it were reviewing a decision of the Social Security Administration or a bankruptcy court." 336 F.3d at 636 (citing *Sullivan v. Lemoncello*, 36 F.3d 676, 683 (7th Cir. 1994)). "Using whatever materials are available, the court must enforce the arbitral award '[s]o long as the [arbitrator's] interpretation can in some rational manner be derived from the agreement, viewed in the light of its language, its context, and other indicia of the parties' intention." *Id.* (quoting *Amoco Oil Co. v. Oil, Chem. & Atomic Workers Int'l Union, Local 7–1, Inc.*, 548 F.2d 1288, 1294 (7th Cir. 1977)).

Both *Roadmaster* and *Butler* applied these same principles to two different sets of facts. In *Roadmaster*, the arbitrator explicitly recognized the conflict between the CBA and the statute and opted to apply the law over the contract. That contract "specifically limit[ed] [the] arbitrator's subject matter jurisdiction," so we held that he "should restrict his consideration to the contract, even if such a decision conflicts with … statutory

law." 851 F.2d at 889. In contrast, in *Butler* we found language in the agreement designed to incorporate external law. Because the parties had bargained for such an arrangement, we determined that application of the law "lay well within the arbitrator's authority despite the fact that the arbitrator's opinion did not spell this out." 336 F.3d at 636.

Since our decision in *Roadmaster*, it seems that unions and employers have begun to incorporate external law into their CBAs more frequently. *See, e.g.*, Martin H. Malin, *The Evolving Schizophrenic Nature of Labor Arbitration*, 2010 J. Disp. Resol. 57, 63–64 (describing the increase in government regulation of industry and the changing interaction between arbitration and public law). When that is the case, we will respect the parties' decision *ex ante* to allow the arbitrator to apply external law, as we did in *Butler*.

### A. The Arbitrator's Analysis was Incomplete

In this case, the arbitrator issued a lengthy, reasoned award that directly engaged with the tensions between the CBA and the public statute.[1] (R. 6-3 at 42–44) In fact, Arbitrator Fleischli cited to an academic article he wrote in 1989 commenting on our decision in *Roadmaster* and placing it in the context of a long-running academic debate on the topic. *See id.*

---

[1] The parties disagree about whether the Workplace Violence Policy arises out of the CBA. The company, citing to a long string of NRLB decisions holding that workplace safety rules are a mandatory subject of bargaining, argues that the policy comes within the broad bargaining environment and is therefore part of the CBA for the purposes of applying the rule in *Roadmaster*. The union contends that the company unilaterally issued the policy and that it is not entitled to deference as part of the CBA. We need not reach the issue, however, because we find that the CBA incorporates external law sufficiently to uphold the arbitration award.

at 43 (citing George R. Fleischli, *When Can a Grievance Arbitrator Apply Outside Law?*, 18 J. L. & Educ. 505 (1989)). He also attempted to distinguish his own award from *Roadmaster*:

> The Union is not asking the Arbitrator to ignore a provision of the Agreement, which would arguably violate the contractual limits on his authority. Further, it is not asking the Arbitrator to nullify the Company rule … . It is asking the Arbitrator to conclude that the rule is illegal and unenforceable, as applied to an employee, holding a concealed carry license.

*Id.* at 43–44.

We find his attempt less than satisfying. While he acknowledged the rule in *Roadmaster*, he then went on to find a company rule "illegal and unenforceable" based on a lengthy analysis of the text and legislative history of the Concealed Carry Act. *Id.* His distinction was without a difference.

The district court in this case took the arbitrator at his word. It analyzed the reasoning contained in the award and, relying primarily on our decision in *Roadmaster*, concluded that Arbitrator Fleischli went outside the scope of his charge to determine whether there was just cause to terminate Knox.

*B. But Other Language in the CBA Incorporates External Law*

In *Arch*, we reiterated that "before we reject an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based his decision on noncontractual grounds." 85 F.3d at 1293. In that case, as here, we had to determine whether the arbitrator's interpretation of the "just cause" language in the CBA violated the scope of his authority. We observed that "[j]ust cause is a

flexible concept, embodying notions of equity and fairness, and is certainly open to interpretation by the arbitrator." *Id.* at 1294. Given that we only "set aside an arbitration award if 'there is no possible interpretive route to the award[] so [that] a noncontractual basis can be inferred,'" we had little trouble discerning the interpretive route and holding that the arbitrator's reasoning was "not so far-fetched as to lead us to deduce that the arbitrator relied on a noncontractual basis for the award." *Id.* at 1293–94 (quoting *E.I. DuPont de Nemours & Co. v. Grasselli Empl. Ind. Ass'n of East Chicago, Inc.*, 790 F.2d 611, 614–15 (7th Cir. 1986), *abrogated on other grounds by Misco*, 484 U.S. 29).

This was the same path we followed in *Butler*. In that case, there was language in the CBA that "allowed the arbitrator to consider external law[,] and the parties framed the arbitration proceedings to force consideration of [that law]." 336 F.3d at 636. Although "the arbitrator did not include any explanation of this point in his written award, that fact [did] not mean that there [was] no 'justifiable basis' for the arbitrator's decision." *Id.*

We find this case to be more akin to the facts of *Butler* than those at issue in *Roadmaster*. The CBA contains the following language in its preamble:

> Any provisions of this Agreement found by either party to be in conflict with State or Federal statutes shall be suspended when such conflict occurs and shall immediately thereafter be reopened for amendment to remove such conflict.

(R. 1-1 at 4)

This provision is arguably clearer than the language that we found sufficient in *Butler*. Although both the arbitrator and

the district court overlooked the provision, we believe that it firmly establishes the intent of the parties to bring external law such as the Concealed Carry Act within the scope of the bargain.[2] Further, both parties framed their arguments to the arbitrator in terms of the statute. Because that is the case, the courts have no further role to play in reviewing the terms of the award or whether the arbitrator correctly applied the law.

### III. CONCLUSION

"[T]his arbitral award should be enforced because it is supported by the terms of the parties' agreement and thus lay well within the arbitrator's authority despite the fact that the arbitrator's opinion did not spell this out." *Butler*, 336 F.3d at 636. Language contained in the preamble of the collective bargaining agreement suspends any part of the CBA that either the company or union believes to conflict with state law. While we would have preferred that the arbitrator cite to that language before applying the Concealed Carry Act to reinstate Knox, the extraordinarily deferential standard of review compels us to uphold the award.

For those reasons, we VACATE the district court's order and ENFORCE the arbitral award.

---

[2] We stress that although the original dispute involved rules regulating the carrying of firearms, today's dispute deals solely with the law of labor arbitration. Neither party has raised any claim under the Second Amendment, and we express no opinion regarding the Concealed Carry Act or internal corporate policies regarding weapons.