**Earl R. BREES, Appellant,**

v.

**Robert E. HAMPTON, Individually and as Chairman of the United States Civil Service Commission, et al.**

No. 88–5273.

United States Court of Appeals, District of Columbia Circuit.

Argued March 13, 1989.

Decided June 13, 1989.

Rehearing and Rehearing En Banc Denied Aug. 29, 1989.

Tracy E. Mulligan, with whom Glenn H. Carlson was on the brief, for appellant.

Molly D. Current, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, for appellees. Daniel Bensing, Asst. U.S. Atty., also entered an appearance for appellees.

Before MIKVA, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This is the appeal of a Title VII action, 42 U.S.C. § 2000e–16, brought by the administrator of the estate of the late Earl R. Brees. The defendant-appellees ("defendants") are three U.S. government agencies: the Office of Economic Opportunity ("OEO") (now the Community Services Administration), the Civil Service Commission ("Commission"), and the Department of Commerce ("Department"). The initial complaint also named as defendants the heads of the agencies in their individual capacities, but the district court dismissed these counts, and that portion of the ruling has not been appealed.

Appellant argues that beginning in 1968, Mr. Brees, a white male, was unlawfully discriminated against on the basis of his race and was subjected to reprisals for complaining about that discrimination. Appellant maintains that defendants unlawfully denied Mr. Brees employment and promotion within the federal civil service, and, as evidence of reprisals, points to alleged violations of federal personnel regulations and to various administrative proceedings that were assertedly conducted in an unfair fashion. The district court, however, granted summary judgment for the defendants because it found that the principal charges in appellant's complaint were precluded by a 1971 settlement agreement voluntarily entered into by Mr. Brees, and that the remainder of appellant's claims had little merit. *See Brees v. Hampton,* Nos. 74–0972, 75–0178, Memorandum opinion (D.D.C. July 20, 1988) ("Mem. op."). We agree with the district court.

It is discomfiting that this lawsuit, which began in 1974, is only now concluding. While in some cases such a long delay might be justified, in this instance the judicial system suffers the blame. The summary judgment motions should have been decided within a reasonable time frame or the case should have been ordered to trial.

### I.

Earl Brees was a disabled veteran honorably discharged from military service in 1960. During the next six years, he obtained a college degree and worked from time to time in both federal civil service jobs and in the private sector. In 1967, Mr. Brees worked for a private travel company, Travel Consultants, Inc., as controller. In early May 1967, he signed five checks drawn on his company's account, totalling over $80,000, all payable to "J.R. Bishop," his wife's maiden name. His company became aware of his action, and on May 27, 1967, he was arrested for embezzlement. The charge was changed first to forgery, and then later to false pretenses. On September 15, 1967, Mr. Brees pled guilty to the misdemeanor charge of "attempted false pretenses," received a one-year sentence (which was suspended), and was placed on probation for a year.

On June 8, 1967, Mr. Brees was hired by the Interior Department's Bureau of Land Management as an operating accountant, GS–9. He sought transfer to the Accounting Systems Branch, Finance Division, of the OEO. On May 25, 1967 (two days prior to his arrest) he had submitted an employment application to the OEO, question 37 of which asked: "Have you ever been convicted of an offense against the law or forfeited collateral or are you now under charges for any offense against the law?" Mr. Brees answered "No."

On August 27, 1967, Mr. Brees was transferred from the Interior Department to OEO, where he was employed as a GS–11 accountant. On August 28, he signed an appointment affidavit ("Standard Form 61"), which contained the following question: "Since you filed [an] application resulting in this appointment, have you been arrested, charged or held by Federal, state or other law enforcement authorities for any violation of any Federal law, state law, county or municipal law, regulation or ordinance?" Mr. Brees responded "No." On the same day his fingerprints were taken and a routine National Agency Check and Inquiry was begun.

By all accounts, Mr. Brees performed his job satisfactorily, and on October 22, 1967, he was promoted to a GS–12 position. On March 1, 1968, the Civil Service Commission notified the OEO Personnel Security Officer that the National Agency Check and Inquiry had revealed Mr. Brees' prior arrest. On March 6, OEO requested that the Commission conduct a full field investigation of Mr. Brees.

By letter of June 27, 1968, OEO notified Mr. Brees that it proposed to remove him from his position because he had falsified his Standard Form 61. On July 19, after receiving his reply, OEO dismissed him, effective August 3. On August 2, 1968, Mr. Brees sent separate letters to President Lyndon B. Johnson and to the complaints officer at the Commission, in which he alleged that he was the victim of racial discrimination, and on the same day he

appealed to the Appeals Examining Office of the Civil Service Commission. Mr. Brees contended that had he been black, he would have been granted rehabilitated offender status and would not have been terminated.

On January 21, 1969, the Appeals Examining Office set aside Mr. Brees' removal, on the ground that the Standard Form 61 he had signed in August required him to disclose only events that occurred after the date that OEO had received his initial application (which, although dated May 25, was not in fact received by OEO until August). On February 4, Mr. Brees was reinstated to his position at OEO but at the same time received a letter dated January 31 proposing his removal on different grounds (fraud and deception in obtaining federal employment, and criminal conduct). He was dismissed on March 5, effective March 7. Mr. Brees appealed within OEO and was given a hearing before a Hearing Committee in November and December 1969. The Committee unanimously recommended his reinstatement to a less sensitive position, concluding in its report of March 6, 1970 that OEO's action in discharging him a second time was "not taken in good faith." The Committee found that "[r]ather than reinstat[ing Mr. Brees] and try[ing] to live with the situation, OEO made the decision to terminate him again, come what may," even though Brees was a "superior worker." The Committee concluded:

We find that the underlying cause for the second discharge was the agency's hostility to Mr. Brees which had built up since the first discharge and which he had exacerbated by his victory at the Civil Service Commission. We find that the agency rationalized its predetermined decision not to reinstate [Mr. Brees] * * *.

On March 31, 1970, however, OEO issued a final agency decision sustaining the discharge on the ground of criminal conduct.

Mr. Brees again appealed to the Appeals Examining Office, which rescinded OEO's decision and remanded the discharge case to the agency with instructions to process several discrimination complaints that Mr.

Brees had filed but that OEO had not yet acted upon. This delay violated regulations requiring that discrimination complaints be processed within 60 days in cases where hearings were not held, and within 90 days where hearings were held, see 5 C.F.R. § 713.218(a) (1969); 5 C.F.R. § 713.220(a) (1970). On January 21, 1971, the Commission's Board of Appeals and Review rejected OEO's appeal from the Appeals Examining Office decision, and on February 11, 1971, OEO began processing Mr. Brees' discrimination complaints. An equal employment opportunity ("EEO") counselor was appointed in April 1971, and a report completed in June. The EEO counselor stated that he could not determine whether OEO had discriminated against Mr. Brees on the basis of his race, because the agency refused to make available the criminal records of black felons so that the treatment they received could be compared with that of Mr. Brees. Nevertheless, the counselor found that "the sequence of events point[s] quite strongly to the possibility of discrimination in the form of reprisals against Mr. Brees because he filed a complaint of discrimination." As support for his conclusion, the counselor noted that "[i]t is difficult to understand why OEO would be unwilling to simply transfer Mr. Brees to a position unrelated to finance." On June 30, 1971, OEO requested the Commission to furnish an investigator for Mr. Brees' EEO claim against the agency, and on July 21, OEO was notified that an EEO investigator had been obtained from the U.S. Information Agency.

Meanwhile, between May 1968 and February 1969, the Washington Area Examining Office of the Civil Service Commission received several applications for employment from Mr. Brees. As was customary in such cases, the applications were referred to the Commission's Bureau of Personnel Investigation ("BPI") for a determination of the applicant's "suitability" for federal employment. On March 5, 1969, BPI issued a show-cause letter to Mr. Brees informing him that he had 15 days to reply to certain information which had surfaced during the investigation of his suita-

bility. BPI listed Mr. Brees' involvement in criminal proceedings; his departure from Travel Consultants at the time the attempted embezzlement was discovered; and the fact that he had listed on all but one of his applications that the reason he left Travel Consultants was "excessive hours of work." BPI received and considered Mr. Brees' reply. By letter dated March 28, 1969, Stanley N. Taylor, Chief of the Division of Adjudication and Appraisal at BPI, notified Mr. Brees that on the basis of his "dishonest conduct," his applications for federal employment had been rated ineligible.

On April 16, 1969, Mr. Brees appealed the rating to Kimbell Johnson, Director of BPI, who affirmed the decision, stating that "[b]ecause of the evidence and recency of your violation of the trust and confidence in employment, the Commission cannot at this time accept your applications for certification to government agencies for employment." Mr. Brees further appealed his rating to the Commission's Board of Appeals and Review, again raising the issue of racial discrimination. On June 3, 1969, the Board sustained the finding of the Director.

In July 1971, Mr. Brees and OEO officials began discussing the settlement of his claims against the agency. These negotiations culminated in an agreement dated August 6, in which OEO promised to cancel Mr. Brees' second removal (dated March 7, 1969), and to reinstate him with back pay (some $19,000). Mr. Brees pledged to take annual leave from August 9, 1971, until October 19, 1971, and to take unpaid leave thereafter until September 6, 1972, at which time he would resign (unless he chose to do so earlier). Mr. Brees agreed that this was in settlement of his claims arising out of the personnel actions taken against him by OEO.

In the summer of 1971, Mr. Brees also became aware of a memorandum drafted by Stanley N. Taylor, Chief of BPI's Division of Adjudication and Appraisal, dated July 7, 1971, and addressed to his supervisor, Kimbell Johnson, Director of BPI. The Taylor memorandum contained alleg-edly defamatory information that would have damaged Mr. Brees' employment prospects. For example, it said that he had been convicted in United States district court on the charge of false pretenses, while in fact he had pled guilty to attempted false pretenses in D.C. Superior Court. The memorandum went on to characterize Brees' appeals as a "perver[sion]" of the civil service appeals process, and commented that "it is absolutely asinine to state that Brees had been 'cleared' by anyone."

On October 28, 1971, Mr. Brees attempted to return to work at OEO and was refused. The next day, he attempted to withdraw his resignation, and this request was also denied by the agency. Mr. Brees then appealed to the Commission, alleging that his resignation was involuntary and that he should be allowed to withdraw it. The Commission determined on May 4, 1973 that the resignation was voluntary and that the agency had valid reasons for not granting the withdrawal request. The district court later remanded the case to the Commission for a full hearing on the issue of voluntariness; the Commission affirmed its earlier decision that the resignation was voluntary.

In 1973, Mr. Brees applied for a temporary position as a computer specialist in the Office of Telecommunications at the Department of Commerce. While his application was being subjected to a pre-appointment check, the Department decided to abolish the position. Appellant charges that the Department acted after receiving false and unfavorable information about Mr. Brees from BPI through improper channels. The Department's Investigations and Inspections Staff conducted an investigation, and a hearing was held on September 18, 19, and 24, 1975. After evaluating all the evidence, the complaints examiner concluded on January 13, 1976 that "the agency's inaction with respect to complainant's applications for various positions was unrelated to complainant's discrimination complaint," and recommended that Mr. Brees' complaint be dismissed. On appeal, the Department's Acting Assistant Secretary for Administration agreed.

Later, a different complaints examiner appointed by the Civil Service Commission found that there was no evidence that any improper release of information by BPI was approved by BPI officials or even known to them.

In late 1973, Mr. Brees submitted additional applications for employment with Commission examining offices in Washington, Oklahoma City, Atlanta, Pittsburgh, and St. Louis. The Washington, Atlanta, and Pittsburgh offices submitted requests to BPI for determinations of suitability, triggered by Mr. Brees' previous rating of unsuitability and his 1969 arrest. Between December 6, 1973, and January 4, 1974, and again between February 6 and 7, BPI conducted investigations of Mr. Brees' suitability. As a result thereof, Mr. Brees was invited to attend a meeting in April to offer any comments, explanations, or information he wished BPI to consider. Mr. Brees replied that on advice of counsel, he preferred to respond via interrogatories rather than in person. By letter dated June 20, 1974, the Commission sent Mr. Brees a statement of information that required his comment, to which he replied on July 1. On June 27, 1974, Mr. Brees filed suit in U.S. district court, and action on the suitability determinations was suspended until the U.S. Attorney later requested that they be completed. In 1975, Mr. Brees received a positive suitability rating.

In December 1973 and January 1974, Mr. Brees filed a series of EEO complaints against BPI and the Commission, alleging racial discrimination and reprisals against him for filing earlier complaints. The Commission initially took the position that 5 C.F.R. § 713.212(a) (1974) permitted complaints of discrimination to be filed against an agency only by its employees or applicants for positions within that agency, and did not authorize complaints such as the one Mr. Brees attempted to file directly against BPI. On November 19, 1975, however, the district court remanded the complaints to the Commission and ordered that they be processed. An investigation was conducted from January 5 through January 28, 1976. Efforts at informal resolution were unsuccessful, and by letter of June 24, 1976, Mr. Brees requested a hearing on his allegations. A prehearing conference was held on January 11, 1977, and the hearing was conducted on April 12, 21, 25–28, June 22, 27–29, and July 6–8, 1977. Mr. Brees was represented by counsel. The complaints examiner concluded that "[t]he evidence presented fails in each instance to show that the actions charged stem from discrimination and/or retaliation for earlier complaints," and recommended that a decision issue "that there was no discrimination and/or reprisal against Mr. Brees." On September 8, 1977, the Civil Service Commission announced its final decision in which it adopted the findings and recommendation of the complaints examiner.

The district court proceeding then resumed. After the Commission's decision on remand, Mr. Brees deposed a number of witnesses, and the government successfully moved for a protective order. On January 18, 1978, the district court granted Mr. Brees' oral motion for leave to file a motion for summary judgment by February 20, 1978; Mr. Brees later sought and was granted extensions. During March 1978, Mr. Brees filed twelve motions for summary judgment, see Mem. op. at 2 n. 2, and on April 19, defendants submitted their response to Mr. Brees' motions and moved for summary judgment as well. Over the next several months, the parties sparred over appropriate statements of stipulated material facts. On June 5, 1979, Mr. Brees moved to compel the Commission and OEO to file the complete administrative record; the defendants filed their response on July 11.

The docket sheets list no substantive development in the case until October 5, 1984, when Mr. Brees requested a settlement conference and submitted a supplemental memorandum of points and authorities in support of his pending motions for summary judgment. The court on February 21, 1985 denied Mr. Brees' request to refer the case to a magistrate for settlement proceedings, and directed the parties to produce a complete administrative record. Thereafter, on October 2, 1985, the court

issued a memorandum and order directing Mr. Brees to show cause within 30 days why his complaint should not be dismissed with prejudice. Mr. Brees responded to this order on October 28, and two days later submitted an outline of the administrative record.

In 1987, Mr. Brees applied to this court for a writ of mandamus to order the district court to issue its decision, and on May 1 of that year, this court denied the petition, commenting that "[w]e are confident that the district court will act with all due haste." *In re Earl Roland Brees*, No. 87–5086 (D.C.Cir. May 1, 1987). On July 2, 1987, counsel notified the district court that Mr. Brees had died. The following year, his estate sought another writ of mandamus, which was rendered moot when, on July 20, 1988, the district court granted summary judgment in favor of the defendants.

The estate of Earl R. Brees appeals.

## II.

### A.

The issue in this case is whether the district court erred in granting summary judgment to the defendants. The Federal Rules of Civil Procedure preclude summary judgment if "there is [a] genuine issue as to any material fact"; otherwise, "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the defendants have carried their burden of demonstrating the absence of any genuine issues of material fact, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), appellant must come forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The defendants need not provide evidence specifically negating appellant's claims, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26, 106 S.Ct. 2548, 2553–55, 91 L.Ed.2d 265 (1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The issue is whether "a fair-minded jury could return a verdict for the [appellant] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Notwithstanding the barrage of charges, investigations, proceedings, reports, and reviews, the district court was correct in finally concluding that no genuine issue of material fact existed in this case. As an initial matter, the settlement agreement itself precludes many of Mr. Brees' claims. The agreement provides that it was entered into

in resolution of the adverse action taken by the Office of Economic Opportunity against Mr. Brees under Federal Personnel Manual Chapter 752 and shall in no way be construed to mean that OEO or any other agency has found or may find in favor of Mr. Brees' complaint of discrimination.

Mr. Brees further promised to "irrevocably withdraw[ ] his complaint of discrimination against the OEO" and "not to file subsequent complaints and appeals resulting from or arising out of the same subject matter as contained in his complaint and appeal or from any decisions heretofore made by the Office of Economic Opportunity concerning Mr. Brees." That agreement bars as a matter of law any action arising out of Mr. Brees' termination from OEO, as well as any subsequent claims resulting from that termination, against OEO or any other agency.

Appellant argues that the settlement agreement is invalid because Mr. Brees was coerced into signing it, and his consent was therefore not "voluntary and knowing," *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974). Appellant also contends that the settlement was not "voluntary" within the meaning of applicable regulations because the government set the effective date of Mr. Brees' resignation, and that the settlement was void both for lack of consideration and because the provision in the agreement making his res-

ignation "irrevocable" was illegal. We address these objections in turn.

■ First, we find that appellant has not established the existence of a genuine issue of material fact with respect to duress or coercion. While Mr. Brees undoubtedly faced financial and other pressures to enter into the settlement agreement, the circumstances surrounding the settlement suggest that it was voluntary. Mr. Brees himself requested the meeting which led to the commencement of the settlement negotiations, and, according to an affidavit submitted by the defendants, Mr. Brees originated the idea that "if he could be reinstated with back pay he would be willing to resign." The Associate Director of the OEO's Office of Administration swore in an affidavit that "[u]ntil Brees had volunteered to resign in conjunction with his reinstatement, the idea of his resignation had never crossed my mind." The settlement agreement itself recites that "Mr. Brees further acknowledges that he made the initial offer to resign and that his offer and the provisions for resignation contained herein were not secured or obtained by duress or coercion." Mr. Brees received a draft of the proposed settlement agreement on July 29, and did not sign it until August 6, indicating that he had more than a week to review it.

■ Nor did the agreement become involuntary within the meaning of 5 C.F.R. § 715.202(a) (1971), which provided that an employee "is free to resign at any time [and] to set the effective date of his resignation," because OEO, rather than Mr. Brees, set the effective date of his resignation. Mr. Brees chose "the effective date of his resignation" by voluntarily entering into the settlement agreement, which provided that:

> Mr. Brees hereby resigns from his position in the Office of Economic Opportunity effective September 6, 1972, unless Mr. Brees decides on his own volition to resign on a date prior to September 6, 1972.

Mr. Brees was a knowing and willing participant in the negotiations that culminated in the settlement agreement, and by his assent to the settlement he fixed his own date of resignation within the meaning of the regulation.

■ Appellant also contends that OEO had legal authority to award Mr. Brees back pay only by virtue of the January 21, 1969, Appeals Examining Office decision ordering his reinstatement, and that his reinstatement with back pay signalled some sort of acceptance by OEO of that decision. The Standard Form 50, Notification of Personnel Action, which cancelled appellant's second removal and reinstated him, cited as authority for the provision of back pay "subchapter IX, 5 U.S.Code." By statute, back pay may be awarded only to an employee "who, on the basis of a timely appeal or an administrative determination * * * is found by appropriate authority under applicable law, rule, [or] regulation * * * to have been affected by an unjustified or unwarranted personnel action." 5 U.S.C. § 5596(b)(1). Regulations promulgated under this section authorized an agency to grant back pay if it determined that a personnel action was "unjustified" or "unwarranted," 5 C.F.R. §§ 550.801(b), 550.803(a) (1971). Appellant maintains that only by implicitly recognizing the illegal nature of Mr. Brees' second removal could OEO have derived legal authority to award him back pay. But if OEO had already determined that the second removal was illegal, then it was under a pre-existing legal duty to reinstate Mr. Brees, and there was no consideration for the settlement agreement. Appellant concludes that faced with this dilemma, defendants must concede either that Mr. Brees' second removal was unlawful and that the settlement agreement was void for lack of consideration, or that OEO had no legal authority to award back pay and that the agreement was void *ab initio* for that reason. We think no such dilemma exists.

Mr. Brees received valuable consideration for the settlement agreement. When it was reached, no *final* decision had been made as to the legality of the second removal. The agreement itself expressly states that OEO did not admit that it or any other agency "has found or may find

in favor of Mr. Brees' complaint of discrimination." OEO had rejected the Hearing Committee's recommendation that Mr. Brees be reinstated, and he had appealed to the Commission's Appeals Examining Office. The Commission then vacated OEO's decision to remove him and remanded the case to OEO with instructions to process his discrimination complaints. Whatever the merits of Mr. Brees' claim that his second removal was illegal, he was by no means assured of prevailing; at the very least, his back pay and vacation credits would have been received only after substantial delay.

The second horn of OEO's alleged dilemma is equally frail. We see no basis for appellant's assumption that the civil service regulations required OEO to admit that Mr. Brees' discrimination complaint was valid as a prerequisite to awarding him back pay. Appellant, following the OEO Hearing Committee's report of March 6, 1970, maintains that OEO did not act in good faith in terminating Mr. Brees for a second time so soon after the Appeals Examining Office had ordered him reinstated. But this does not mean that Mr. Brees could not have been terminated later, on different grounds. By way of illustration, the Appeals Examining Office opinion of January 21, 1969, which had ordered Mr. Brees reinstated after his first removal, cautioned that:

> In issuing this opinion we do not mean to suggest that [Mr. Brees'] conduct in connection with his application for Federal employment is praiseworthy or that he acted with full candor. Nor are we saying that the agency is powerless to seek and effect the appellant's discharge [on] the facts exhibited in this record. All we hold is that the agency has not supported its charge that Mr. Brees falsified Standard Form 61.

Mem. op. at 7. OEO, for example, might have determined that Mr. Brees' second removal was "unwarranted" or "unjustified" because it was not undertaken in good faith, and yet have retained the ability to discharge Mr. Brees again, on the same or other grounds, if it followed the correct procedures. OEO, in other words, could have conceded that the second removal was procedurally improper, and paid Mr. Brees back pay under the settlement agreement, without extinguishing its right to terminate him later.

Finally, appellant argues that the agreement was void because OEO refused to permit Mr. Brees to withdraw his resignation. The applicable regulation provided that:

> A resignation is binding on an employee once he has submitted it, except that the agency, in its discretion, may permit the employee to withdraw his resignation at any time before it has become effective.

5 C.F.R. § 715.202(b) (1971). In 1973 the regulation was amended and another sentence added: "An agency may decline a request to withdraw a resignation before its effective date only when the agency has a valid reason and explains that reason to the employee." The settlement agreement in this case provided that the appellant's resignation was "irrevocable" and "shall not be withdrawn by Mr. Brees," which appellant maintains violated even the 1971 version of the regulation.

■ Even assuming *arguendo* that Mr. Brees could not bargain away whatever entitlement he had to withdraw his resignation, the regulation by its terms vested discretion in the agency over the matter, and OEO did not abuse its discretion in this case by refusing Mr. Brees' request to withdraw his resignation. The Commission noted that by means of the settlement, OEO had reinstated Mr. Brees, paid him back salary, and provided him vacation time credits, all on the assumption that Mr. Brees would resign. Permitting Mr. Brees to withdraw his resignation would have allowed him to renege on his part of the bargain. We defer to the Commission's view that the settlement did not contravene civil service regulations. "An agency's interpretation of its own regulations is entitled to great weight." *Tallahassee Branch of the NAACP v. FCC,* 870 F.2d 704, 710 (D.C.Cir.1989).

**B.**

■ Appellant urged several additional claims before the district court, all of which

were correctly rejected by the summary judgment. The administrative record raised no genuine issue of material fact for trial.

Appellant maintains that the background check of Mr. Brees conducted in 1968 and 1969 was discriminatory. The record shows, however, that BPI routinely conducted suitability determinations on applicants referred to it by all federal agencies. An EEO complaints examiner who reviewed the case in 1977 concluded that "[t]he 1969 suitability rating was found, on appeal through appropriate Civil Service channels, to have been in full consonance with the regulations governing BPI at the time," and that "neither the initiation of nor the outcome of the 1969 suitability determination appears to have been either discriminatory or regulatory." The EEO complaints examiner also found that "[n]o conclusion of discrimination or disparate treatment can be drawn." All Washington area applications were at that time referred to BPI, and "there was no indication that Mr. Brees received any different treatment * * * from any other applicant."

Second, appellant claims that BPI discriminated and retaliated against Mr. Brees by unreasonably delaying the completion of his 1973–74 suitability determination. We find, however, that although a delay may have occurred, there was no indication that it was due to discrimination against Mr. Brees. Contributing to the delay were factors for which Mr. Brees must share some responsibility: the congressional inquiries into BPI that he instigated, his decision to file suit in U.S. district court, and his desire to respond in writing to BPI's requests for information, rather than to appear in person as BPI had suggested. While BPI evidently did not act with dispatch during this entire protracted epic, appellant has introduced no evidence that this delay was discriminatory in nature.

Third, appellant contends that the Commission discriminated against Mr. Brees by initially refusing to process his discrimination claim against BPI in December 1973. This refusal, however, cannot serve as a cause of action, because Mr. Brees has already received a remedy; the district court ordered the Commission and BPI to process his complaints. A hearing was held, and an examiner made extensive findings of fact accepted by both the Commission and district court, *see* Mem. op. at 15–16. The hearing examiner concluded that Mr. Brees' complaints before the Commission and BPI were meritless, and that he had not established that he had suffered either discrimination or reprisals.

Fourth, appellant maintains that the Commission discriminated against Mr. Brees by failing to provide a full and fair hearing and decision on his discrimination claims. Specifically, appellant alleges that numerous procedural defects occurred in the Commission's investigation and hearing on remand from the district court. The district court found that any such defects were "either nonexistent or inconsequential to the overall fairness of the various proceedings," Mem. op. at 18, and we agree. The procedural complaints were examined in detail by the Commission, and none has merit.

Fifth, appellant argues that BPI and the Commission discriminated against Mr. Brees by interfering with the preparation and prosecution of his discrimination claims. Appellant alleges that the Commission failed to provide Mr. Brees with uncensored versions of documents during the hearings on remand ordered by the district court. Portions of documents were deleted, for example, on the ground that they were "embarrassing to the government's case." An EEO complaints examiner, however, has already rejected appellant's argument, finding that the relevant passages "do not pertain to the issues at hand and there was therefore no impropriety in their deletion." Appellant provides no reason why this conclusion is in error.

In addition, appellant contends that BPI withheld necessary statistical information comparing the treatment of white and black ex-offenders under the Rehabilitated Offender Program. On remand from the district court, an EEO complaints examiner discussed this allegation at length and concluded that compilation of the statistics

would be a monumental task that could be accomplished only through a manual search of three to five million records. As a practical matter, then, the information was unavailable.

Finally, appellant contends that the Commission and BPI discriminated against Mr. Brees by illegally furnishing false derogatory information about him to the Department of Commerce. In 1973, when Mr. Brees applied to the Department, he was allegedly told by Commerce officials that he was qualified for a position there. The position for which he applied was later abolished. Appellant contends that this action was taken on the basis of defamatory information furnished by BPI.

An EEO complaints examiner, however, after an extensive investigation and hearing, found that the elimination of the position was not a product of discrimination against Mr. Brees. Instead, the examiner found that the references provided by Mr. Brees did not supply evidence favorable to his employment application. As a result, the Commerce Department contacted BPI, and learned that an investigation regarding Mr. Brees' suitability was underway. Consequently, the Department held Mr. Brees' application in abeyance pending receipt of a report from BPI. This is the same 1973 suitability determination that we have already found was not delayed because of discrimination or reprisals. In the interim, the position was abolished. The examiner found no evidence of a reprisal; he noted instead that "[t]he alleged inability to obtain information concerning [Mr. Brees'] past employment arose prior to [his] filing the discrimination complaint." We find that even if an unauthorized release of information occurred, there is no evidence that it damaged Mr. Brees in any way. We have no occasion to pass on the defendants' suggestion that they are not liable for the release of information in any event because BPI's policy forbade it and because no BPI official in any position of authority approved the release or was aware of it, *see Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72–73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986).

In sum, appellant has failed to present an issue of material fact regarding Mr. Brees' Title VII claim.

## C.

We regret the necessity for commenting on the long period of time during which the parties' respective motions for summary judgment were pending before the district judge. Summary judgment is intended to shorten proceedings, not draw them out. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); 10 C. Wright and A. Miller, *Federal Practice and Procedure* § 2712, at 563 (2d ed. 1983). It is no accident that the first Federal Rule of Civil Procedure proclaims that the purpose of the Rules is "to secure the just, speedy and inexpensive determination of every action."

As civil caseloads continue to increase, *see* Marvell, *Caseload Growth—Past and Future Trends*, 71 Judicature 151, 153 (1987), the court system must be ever more sensitive to avoidable litigation delays. A strictly enforced litigation calendar is indispensable in controlling such delays, *see* Mahoney & Sipes, *Zeroing In On Court Delay: The Powerful Tools of Time Standards and Management Information*, 1985 Ct.Mgmt.J. 8, 11–12. If reasons exist why a district court cannot pass on a motion for summary judgment within a reasonable period of time, then it must move forward to the next stage of the calendar and schedule the case for trial. *See* Levitt, *A Simple Solution to Judicial Gridlock*, 27 Judges' J. 32, 33 (Summer 1988) (Michigan 30–month track from filing to disposition for civil cases); Moran, *Stating the Case for Timely Justice*, 8 State Ct.J. 23, 25 (Fall 1984) (18–month proposal by Conference of State Court Administrators). Such a system of automatic, self-operating deadlines is reflected in the Speedy Trial Act, 18 U.S.C. §§ 3161–3174, which regulates the pace of criminal proceedings. While the philosophy of the Speedy Trial

Act is of course inappropriate in the civil context, the Act reminds all of us that either we keep our own dockets in a timely fashion, or Congress can provide some strong antidotes to justice delayed.

\* \* \* \* \* \*

For the reasons stated, the judgment of the district court is

*Affirmed.*