**Walter F. LISEK, Plaintiff,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

**No. 92 C 7464.**

United States District Court, N.D. Illinois, Eastern Division.

Feb. 28, 1996.

---

Glenn E. Heilizer, Laterza & Heilizer, Chicago, IL, for Plaintiff.

Mark D. Perreault, Norfolk Southern Corporation, Norfolk, VA, James S. Whitehead, Sidley & Austin, Chicago, IL, for Defendant.

## OPINION AND ORDER

BURNS, Senior District Judge.

Plaintiff Walter Lisek brings this action to recover wages lost when Defendant Norfolk and Western Railway Company (NW) allegedly dismissed him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and specifically 42 U.S.C. § 2000e–2(m), which prohibits the use of race as a motivating factor for employment practices. Both Lisek and NW seek attorneys' fees and costs pursuant to 42 U.S.C. §§ 2000e–5(g) and (k). This Court has jurisdiction under 42 U.S.C. § 2000e–5(f)(3).

Plaintiff has had a long and lonely journey through the court and court-like system ever since he fell asleep on his job as a brakeman in June 1987 and was fired. Although I have substantial sympathy for plaintiff, if I were to grant redress to him, given the facts and the law, I would be reaching a legally erroneous result. To do so would be to violate my oath to obey the United States Constitution, the statutes, and those regulations that are binding on me. Because I refuse to do so, I find and hold against plaintiff and in favor of defendant railroad. Herewith are my findings of fact and conclusions of law.[1]

## FACTUAL AND PROCEDURAL HISTORY

In 1974 Lisek began working for NW as a switchman. Two years later, Lisek quit his job because of an injury sustained in an off-duty accident. On March 5, 1984, Lisek returned to work for NW.

On June 18, 1987, NW dismissed Lisek for sleeping while on duty as a brakeman. Lisek appealed his dismissal to the next highest officer, Donald Patterson, Superintendent of the Chicago Terminal.

On August 19, 1987, Superintendent Patterson denied Lisek's appeal. Lisek then appealed to the Public Law Board (PLB) pursuant to the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq.* On May 20, 1988, PLB No. 4469 found NW's dismissal of Lisek constituted excessive discipline. The PLB directed NW to immediately reinstate Lisek, but denied Lisek's claim for lost wages. On June 14, 1988, NW reinstated Lisek without back pay. Lisek did not appeal the PLB decision.

In August 1987, while Lisek was working his way through the appeal channels provided by NW company policy and the collective-bargaining agreement between NW and the United Transportation Union (UTU), he also filed complaints with the Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission (EEOC). Lisek contended his dismissal was the result of NW's racially discriminatory employment practices as evidenced by the fact that, *inter alia*, NW did not dismiss four African–American employees who were also caught sleeping while on duty. On July 11, 1990, Illinois Administrative Law Judge Maren J. Dougherty found that Lisek established a *prima facie* case of discrimination. The ALJ concluded, however, that Lisek failed to show NW's nondiscriminatory reasons for dismissing Lisek were pretextual. ALJ Dougherty, therefore, recommended dismissal of Lisek's complaint. Lisek appealed the ALJ's decision to the Illinois Human Rights Commission (Commission).

On November 2, 1990, the Commission concluded Lisek's "work record was worse than that of his comparatives, and thus provides a legitimate, nondiscriminatory reason for the difference in treatment." Accordingly, the Commission affirmed and adopted ALJ Dougherty's Recommended Order and Decision and dismissed Lisek's complaint with prejudice.

On August 16, 1992, after examining the record and giving substantial weight to the findings and decision of the Illinois Department of Human Rights, the EEOC issued a Determination in which it also concluded that Lisek failed to establish that NW violated Title VII when it dismissed Lisek. On November 11, 1992, Lisek filed a Complaint in this Court.

Although this case should have been settled early on, instead it was tried in spurts, fits, and starts on April 24 and April 25, 1995. At the end of testimony, the parties and counsel met with The Honorable Wayne R. Andersen, United States District Judge, who devoted most of a day trying to persuade the parties to resolve this case. The genie, however, could not escape from Judge Andersen's lamp despite the insight, experience, and patient perseverance he brought to the sessions. After the parties submitted

---

1. This opinion comprises my findings of fact and conclusions of law, whether specifically so designated or not, pursuant to Fed.R.Civ.Proc. 52.

lengthy and thorough post-trial briefs, oral argument was unnecessary. Alas, it is now left to me to decide.

## BACKGROUND

### NW's Progressive System of Discipline

NW has an established set of safety, operating, and general conduct rules for employees. Supervisors are guided by NW's "Supervisor's Manual of Procedures for Holding Investigations (May 1983)" (Manual) when employees violate company rules. The Manual states the purpose for imposing discipline on wayward employees is "to correct wrongdoings and misconceptions, to improve attitude and performance and to increase understanding of the necessity of rule observance for a safe and efficient organization." The Manual also contains a corporate equal employment opportunity policy that requires all terms and conditions of employment to be administered in a nondiscriminatory fashion.

NW has no written guidelines that identify certain infractions as warranting specific disciplinary action; i.e., discipline is determined on a case-by-case basis. When an employee violates NW's rules, the employee is subject to NW's Progressive System of Discipline (System). Under the System, supervisors consider the following factors:

1. Whether any extenuating circumstances exist;
2. The severity (i.e., the seriousness) of the offense; and
3. The employee's record (including length of service, number and type of previous infractions, circumstances surrounding the prior discipline, degree of discipline previously imposed, amount of time elapsed since the last violation, and credits or commendations).

In addition to the official record of formal disciplinary actions, supervisors may look at an employee's record card,[2] which includes

oral warnings about safety rule violations. Supervisors also consider whether an employee willingly accepts responsibility for his misconduct.

A hearing is required before disciplinary action is entered on an employee's official record. An employee may acknowledge responsibility for his actions by waiving his right to an investigation and hearing and accepting the discipline NW decides to impose; however, NW is not required to provide an employee with the opportunity to execute a waiver nor to accept an employee's offer to execute a waiver.

If a hearing is held and the charges against the employee are upheld, NW can impose the following punishments: Letters of reprimand, deferred suspension for a certain number of days (which is converted to actual suspension days if the employee is disciplined again within the period of suspension), actual suspension for a certain number of days, or dismissal. Under the System, the severity of the punishment increases when an employee repeats the same misconduct or the employee's offenses are increasingly serious; at the same time, the degree of punishment begins at a lower level when the employee commits a violation different from or lesser than previous infractions.

To ensure uniformity and fairness, a multi-tiered appeals process is available. All disciplinary decisions may be appealed to the next highest officer, which generally means the Superintendent of the Chicago Terminal. If an employee is still dissatisfied with the outcome, he may ask his union representative to file a grievance with the labor relations officer. After on-site appeals are exhausted, the employee may take his case before a PLB pursuant to the RLA. Within the statutory limits and the narrow review permitted by the RLA, the employee may finally appeal the PLB's decision to a United States district court.

---

**2.** Rule 49 § 1(a) of the Rules and Rates of Pay for employees represented by the UTU provides that:

> Trainmen will not be discipline[d], suspended, dismissed, nor have an entry made against their personal record without first being given a fair and impartial hearing.

Lisek argues this term of the collective-bargaining agreement prohibits NW from considering his unofficial record card for the purpose of determining discipline; however, interpretation of the UTU collective-bargaining agreement and the question of whether NW's consideration of employees' unofficial record cards violates the agreement is irrelevant to the issue before me.

*Lisek's Disciplinary Record*

Lisek's official disciplinary record includes the following violations:

1. *.8/84 Safety Rule 1013*, 5 days deferred suspension.

Lisek was found in violation of Rule 1013 for failure to observe passing train. Before this incident, Lisek had received two oral warnings with follow-up letters regarding other rule violations.

2. *10/84 Safety Rule 1111(m)*, 15 days deferred suspension.

Lisek was found in violation of Rule 1111(m) for being in an improper position next to a switch or, in other words, for unsafe switch operation.

3. *1/85 Failure to Leave Bills for Train*, Letter of Reprimand.

Lisek admitted the violation and received a letter of reprimand for failing to comply with instructions and negligently handling company business.

4. *5/85 Safety Rule 1111(m)*, 30 days actual suspension.

Lisek was found to be standing too near the switch. He received harsher discipline than would otherwise have been imposed because of his boisterous insubordination and use of profanity when he was confronted by supervisors.

5. *10/85 Safety Rule 1111(d)*, 10 days actual suspension.

Lisek was found to be in an improper position next to a switch.

6. *6/86 Derailment/False Statements and Concealed Facts*, 60 days actual suspension.

Lisek and three other employees were found to be responsible for a derailment. Lisek received harsh discipline because he was found to be primarily responsible for the derailment by allowing a coupler to mismatch and because he made false statements and concealed facts concerning the incident.

Lisek's record also shows he received a letter of commendation in September 1986 for discovering and reporting a leaking tank car.

Although not found in Lisek's official record, NW enumerates, and Lisek acknowledges, the following additional incidents:

1. *1984:* Lisek received two oral warnings confirmed by letters for safety violations. NW provided Lisek with personal safety counseling after Lisek requested leniency for another violation.

2. *1986:* Lisek received a warning letter for misuse of company radio.

3. *1987:* Lisek received a letter of reprimand for littering the company lunchroom. In March 1987, Lisek also accepted responsibility for derailment of a train and received a 15–day deferred suspension.

Lisek was also summoned to approximately 8 or 9 disciplinary hearings in which NW found no discipline was warranted.

*The Sleeping Incident*

In June 1987, Lisek was dismissed by NW for sleeping while on duty as a brakeman. At the time of the incident, Lisek was responsible for protecting the rear end of the train in the event of a backward movement and forwatching for movement of other trains toward the train on which Lisek was a brakeman. Two NW supervisors saw Lisek sleeping in the caboose. The charges included the supervisors' statements that the train was moving when Lisek was observed sleeping. When confronted by the supervisors, Lisek denied being asleep and said he was just "cooling out." NW sent a letter to Lisek stating a disciplinary hearing would be held and no waiver would be accepted. Approximately one day later, Lisek asked to waive his right to an investigation and hearing by accepting responsibility for the incident as charged. NW refused to accept Lisek's waiver. A hearing was held June 16, 1987, with Assistant Superintendent Salmons presiding. At the hearing, Lisek was represented by W.L. Binner, UTU Local Chairman 1895. Lisek was also permitted to testify and to present witnesses. On June 18, 1987, Salmons notified Lisek of his dismissal.

*DISCUSSION*

Title VII of the Civil Rights Act of 1964 prohibits employers from permitting or engaging in disciplinary practices that take into

account the race of employees. 42 U.S.C. §§ 2000e–2(a)(1) and (m).

█ If a plaintiff meets his or her burden of establishing a *prima facie* cause of action against defendant for racially discriminatory employment practices, defendant must then rebut the presumption of discrimination by "articulating some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Timms v. Frank,* 953 F.2d 281, 286 (7th Cir.), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2307, 119 L.Ed.2d 228 (1992).

█ If defendant meets its burden, plaintiff must then persuade the Court that defendant's reasons are mere pretext for discrimination; i.e., "that a discriminatory reason more likely motivated" defendant's actions. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

Before uniting fact with law, I will address the parties' concerns regarding the weight to be given the findings and decision of the Commission.[3]

█ Lisek correctly asserts the decision of the Commission does not foreclose him from *de novo* consideration of his claim by this Court. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 59–60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974); *Buckhalter v. Pepsi–Cola General Bottlers, Inc.,* 820 F.2d 892, 894–95 (7th Cir.1987). The Supreme Court has held that findings and decisions previously made by a state agency may generally be admitted as evidence and "accorded such weight as the Court deems appropriate" in its discretion. *Alexander v. Gardner–Denver Co.,* 415 U.S. at 60, 94 S.Ct. at 1025. The Court also noted the district court's determination of the weight to be accorded proceedings before state agencies should be tempered by consideration of (1) the degree of procedural fairness, (2) the adequacy of the record with respect to discrimination, and (3)

the competence of the decision-makers. *Id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21.

█ Lisek contends this Court should ignore the Commission's findings and conclusions because of the blatant inadequacy of the evidence presented to ALJ Dougherty and because of NW's omissions and misrepresentations of the facts. *See Tulloss v. Near North Montessori School,* 776 F.2d 150, 152 (7th Cir.1985) ("[A]dministrative findings regarding claims of discrimination are generally admissible under Fed.R.Evid. 803(8)(C) ... unless the sources of information or other circumstances indicate lack of trustworthiness" or the prejudicial effect outweighs its probative value.).

The record of the proceedings before the ALJ reveals Lisek was represented by counsel at the hearing and had the right to engage in full discovery, the opportunity to take depositions, the right to examine and cross-examine witnesses, the right to testify (which he did), the opportunity to introduce exhibits, and the opportunity to submit a post-hearing brief. The transcript also reflects that Lisek offered as exhibits his disciplinary record, the disciplinary records of at least six other NW employees "comparables," and the substance of the PLB's decision. The record also reveals that Lisek had every opportunity to correct misrepresentations and to provide the ALJ with information that may have been omitted by NW. When Lisek appealed the ALJ's recommendation, the Commission also reviewed the written materials and heard oral argument before it affirmed and adopted the ALJ's Recommended Order and Decision.

Based on the foregoing, I find no reason to suspect the ALJ's findings or the information and circumstances upon which the findings were based are untrustworthy or prejudicial to the extent of outweighing their probative value. I further find the proceedings before the ALJ and the Commission were procedurally fair and Lisek had the opportunity to make an adequate record with respect to his charges of discrimination.[4]

---

**3.** The PLB proceedings are excluded because the PLB merely determined whether Lisek's punishment was appropriate. The issue before me is not whether Lisek's misconduct warranted dismissal, but whether NW's dismissal of Lisek was racially discriminatory in nature.

**4.** Lisek did not challenge the competence of the decision-makers.

I also find the ALJ's extensive findings of fact and cogent conclusions of law, together with the Commission's thoughtful and detailed Order and Decision affirming and adopting same, deserve some weight in my consideration of the issues. Although some of the evidence and testimony before the ALJ was identical to evidence and testimony presented to this Court, the Commission's findings and decision are not preclusive; accordingly, I also make my findings and draw my conclusions based on the demeanor and credibility of the live witnesses who testified during trial as well as the writings of the parties and depositions of witnesses.

### PRIMA FACIE CAUSE OF ACTION

■ To establish a *prima facie* cause of action under the particular facts of this case, Lisek must show:

(1) he belongs to a protected class,[5]

(2) he suffered an adverse employment action, and

(3) NW treated him less favorably than similarly-situated, nonwhite employees.[6]

*Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). The burden of establishing a *prima facie* case of racial discrimination "is not onerous"; therefore, a mere preponderance of the evidence is required. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

■ Lisek, like every worker, is protected from an employer's racially discriminatory employment practices; Lisek suffered an adverse employment action when he was dismissed for sleeping while on duty; and disciplinary records show NW did not dismiss several nonwhite employees who were also caught sleeping on the job, which is sufficient to create an inference that Lisek was treated less favorably than similarly-situated, nonwhite employees. I find, therefore, Lisek has established a *prima facie* case of racial discrimination.

### NW'S NONDISCRIMINATORY REASONS FOR DISMISSING LISEK

■ To rebut Lisek's *prima facie* cause of action, NW must articulate a legitimate, nondiscriminatory reason for its dismissal of Lisek. It is sufficient for NW to raise a genuine issue of fact as to whether it discriminated against Lisek. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. NW is only required to present evidence sufficiently "clear and reasonably specific" to allow this Court to rationally conclude NW's decision to dismiss Lisek was not motivated by "discriminatory animus." *Id.* at 254–55, 257–58, 101 S.Ct. at 1094–95, 1095–96.

The seriousness of the offense was a significant factor in NW's decision to dismiss Lisek: NW supervisors testified at the investigative hearing that regardless of whether the train was moving or whether the train had just stopped and began moving immediately after Lisek was observed sleeping or whether the train was in a position vulnerable to moving, sleeping while on duty as a brakeman was a serious offense because of the great potential for injury to person and property.

NW also looked at Lisek's "poor past record" as a whole, which included 13 infractions in three years and consisted of three actual suspensions, three deferred suspensions, two letters of reprimand, and three written warnings; Lisek was also part of approximately nine investigations for safety and rule viola-

---

**5.** Title VII prohibits an employer from engaging in racially discriminatory employment practices against anyone, including whites. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). *See also Kirk v. Federal Property Management Corporation*, 22 F.3d 135, 138 n. 1 (7th Cir.1994); 42 U.S.C. § 2000e–2(a).

**6.** The elements required to establish a *prima facie* cause of action under Title VII vary according to the factual situation. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. For example, the question of whether Lisek performed his job satisfactorily is irrelevant in this instance because "[t]he law tries to protect average and even below-average workers against being treated more harshly than would be the case if they were of a different race." *Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir.1987).

tions in which no discipline was imposed. Lisek repeatedly violated safety rules even though he was given a copy of NW's Safety Rule Book, he attended safety rule refresher classes in March 1984 upon his return to work, and he was provided with personal safety counseling in lieu of discipline for one offense. NW also considered Lisek's past recalcitrance, his reluctance to accept responsibility for the 1986 derailment, and previous incidents where he concealed facts, made false statements, and used profanity.

To further show its dismissal of Lisek was legitimate and nondiscriminatory, NW introduced the disciplinary records of several Chicago Terminal employees, both white and African–American, who were caught sleeping while on duty but were not dismissed. NW justified the disparity in discipline by showing that Lisek's disciplinary record was poorer than the records of the comparables who were not dismissed.

After considering the testimony and written materials, I find NW has articulated legitimate, nondiscriminatory reasons for its action and has presented evidence sufficiently clear and specific for me to rationally conclude NW's decision to dismiss Lisek was not motivated by discriminatory animus.

*NW'S NONDISCRIMINATORY REASONS AS MERE PRETEXT FOR DISCRIMINATION*

The ultimate burden remains with Lisek to persuade this Court that NW's reasons are mere pretext for racial discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

 Lisek has offered no direct evidence that NW discriminated against him because of his race; however, a plaintiff may prove discrimination by circumstantial or indirect evidence. *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). A plaintiff may show defendant's purported reasons are no more than a pretext "by eliminating all lawful motivations, instead of proving directly an unlawful motivation." *Hiatt v. Rockwell Int'l Corp.*, 26

F.3d 761, 768 (7th Cir.1994) (citing *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988)). Lisek may, therefore, establish pretext by showing (1) NW was "more likely motivated" by a discriminatory reason or (2) NW's "proffered explanation is unworthy of credence." *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d at 768.

### 1. Discipline Imposed by NW.

 The heart of Lisek's task rests in showing that NW treated him less favorably on the basis of race by disciplining him more harshly than similarly-situated, nonwhite Chicago Terminal employees. Lisek's proof is buried in the records of comparables. The process of establishing a cause of action under Title VII by working through comparables analogizes to the struggle of working with that other wonderful creation from the Beltway: Sentencing Guidelines. The attempt of both Title VII and Sentencing Guidelines to avoid disparity, albeit a worthy aspiration, does not and will not ever succeed; I am, however, bound to do my best with these flawed master plans.

To convey the flavor of the employee base at the NW Chicago Terminal, Trainmaster Cobbs stated that approximately 158 train and engine service employees worked at NW's Chicago Terminal in 1987. Approximately 80% of these employees were white, 13% African–American, and 7% other minority groups. The vast majority of supervisors were white.[7] NW's records reveal 82 white Chicago Terminal employees were terminated after 2,710 investigations for rule violations during January 1980–90 while 27 African–American employees were dismissed as the result of 751 investigations for rule violations during the same period; thus, approximately 3% of whites who were charged with violations were dismissed and approximately 4% of African–Americans.

Lisek contends NW's racially discriminatory disciplinary practices are reflected in the fact that Lisek was dismissed when caught sleeping while on duty while several African–American employees were not. NW's employment records indicate two African–

---

**7.** In fact, it appears that almost all of the supervisors who charged Lisek, testified against him, and presided at his disciplinary hearings are white with the exception of Trainmaster R.D. Cobbs, who is African–American.

American and ten white employees caught sleeping between 1979–90 were also dismissed while seven African–American and ten white employees were disciplined less harshly than Lisek.

Lisek's evidence of discrimination at the hearing before the Illinois Department of Human Rights centered on the disciplinary records of four of the African–American employees who were not dismissed after they were caught sleeping on the job. The Commission concluded the comparison of Lisek's disciplinary record to the records of the four African–American employees did not suggest NW's disciplinary actions were racially motivated. I concur. Lisek's disciplinary record was worse than three of the four: Lisek's official record reflected at least six violations in three years while Rogers had only seven in sixteen, McGee had six in fourteen, and Allen had nine in twelve. Reeves, the fourth employee, had thirteen violations in eight years, but had never committed an offense serious enough to warrant an actual suspension until the sleeping incident.

Perusal of the records of all of the seven nonwhite employees who were disciplined less harshly than Lisek indicate these employees had fewer and less serious previous offenses, their violations were spread over a longer period of time, their circumstances were different (e.g., duties, authority), they had no record of making false statements or concealing facts in previous incidents, they did not initially deny responsibility for their conduct, and/or the situations involved less risk.

Lisek also contends the 60–day actual suspension he received in June 1986 is illustrative of NW's racially discriminatory disciplinary practices. I disagree. Although the three other employees (two nonwhites and one white) involved in the incident received only 15–day actual suspensions, a review of the record reveals that NW found Lisek primarily responsible for the derailment because he allowed a coupler to mismatch. NW also found that Lisek made false statements and concealed facts concerning the incident. The three other employees were less responsible for the derailment and recanted their initial false stories.

The law does not require that historical comparisons be on all fours: "Utter consistency is difficult" when different decision-makers are involved. *Timms v. Frank*, 953 F.2d at 286. As this Court has noted before, "A pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination." *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994). I find analysis of the comparables does not indicate a significant inconsistency in NW's treatment of employees who were caught sleeping on the job; thus, Lisek has not sufficiently shown that NW treated similarly-situated, nonwhite employees more leniently than Lisek because they happened to be nonwhite.

### 2. NW's Consideration of Personnel Records.

Lisek contends NW either fabricated its purported reliance on incidents outside of Lisek's official record or NW wrongfully relied upon same during the process of determining discipline for the sleeping incident.

 If NW considered the incidents listed on Lisek's record card, Lisek contends NW was engaging in discriminatory disciplinary practices because NW did not consider other employees' "whole" records. I find the testimony of NW's employees credible and accept their assertions that NW considered Lisek's entire personnel record when it decided dismissal was appropriate. Lisek did not produce persuasive evidence that NW considered his whole record merely because he is white or that NW failed to consider the whole records of nonwhites. In addition, I find the legitimacy of NW's articulated reasons for arriving at its decision to dismiss Lisek withstands scrutiny on the basis of Lisek's official record standing alone.

Lisek also points out that NW was prohibited from considering any incidents outside of his official record under the terms of the UTU collective-bargaining agreement; however, the interpretation of and compliance

with the union contract is beyond the scope of the matters before me.[8]

Lisek also asserts NW should have taken into consideration the fact that four of the six incidents on Lisek's official record (including the most serious offenses) were being appealed at the time of the sleeping incident.[9] I find no relevance in this fact since Lisek offers no examples where pending appeals of nonwhite employees were influential factors in NW's disciplinary considerations.

### 3. NW's Refusal to Accept Waiver.

Lisek also contends NW's refusal to allow him to waive his rights to an investigation and hearing by accepting responsibility for his misconduct illustrates NW's racially discriminatory disciplinary practices. I disagree.

Lisek did not offer convincing evidence that NW allowed a disproportionate number of nonwhite employees to execute waivers for serious offenses. NW's records show that during the period January 1987 through March 1989, an almost equal percentage of white and nonwhite employees were allowed to execute waivers. NW's records also reflect that five white employees were permitted to waive hearings when caught sleeping on the job.

Lisek also offered no evidence to indicate NW routinely denied him the opportunity to execute a waiver; in fact, he was permitted to do so relating to the March 1987 train derailment only two months before the sleeping incident.

### 4. NW's Absence of Standards for Imposing Discipline.

Lisek also argues "a case of disparate treatment may be proven where employment decisions are made by supervisors subjectively without definite standards for review, and the decisions result in a pattern clearly" disfavoring employees on the basis of race. *Satz v. ITT Financial Corp.*, 619 F.2d 738, 746 (8th Cir.1980). Lisek contends NW's System fails to set forth standards or rules to ensure discipline is meted out in a uniform and racially neutral fashion; in effect, Lisek argues that supervisors have unfettered discretion to impose discipline under the System, and the result is racial discrimination.

As this Court has noted before, "most employment decisions involve an element of discretion." *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987). NW acknowledges its supervisors have much discretion when determining the validity of rule violations and imposing appropriate discipline. I find, however, the multi-tiered appeals process available to NW employees provides more than a nominal check on supervisors' discretionary powers. In the end, I find nothing in the record that indicates Lisek suffered from the absence of rigid disciplinary guidelines since he had the opportunity to make his case before several fora.

### 5. Miscellaneous Arguments.

#### a. Retaliation.

Lisek contends NW dismissed him in retaliation for his filing of a complaint with the Illinois Department of Human Rights in which he charged NW with racially discriminatory employment practices. Until he filed his complaint, Lisek asserts his union representative was well on the way to getting him reinstated within 60 or 90 days. Lisek has not fully pleaded a cause of action based on retaliatory conduct nor do I find any basis in the record to support such an allegation.

#### b. Lost Wages.

Lisek contends NW's failure to pay his lost wages reflects NW's wrongful employment practices. Lisek appears to be challenging both the PLB decision directing NW to reinstate him without back pay and NW's compliance with the PLB directive.

The PLB found Lisek's dismissal was an excessively harsh disciplinary measure and, as a result, ordered Lisek's reinstatement without back pay. PLB awards are "final and binding" upon both parties to a dispute. A party may turn to the United States district courts to review a PLB's order, 45

---

**8.** Lisek acknowledges he is not seeking to enforce contractual rights under the UTU collective-bargaining agreement.

**9.** The PLB eventually upheld NW's disciplinary decisions in all four appeals.

U.S.C. § 153 First (p) and Second, but all actions must be initiated "within two years from the time the cause of action accrues under the award." 45 U.S.C. § 153 First (r). The statutory time to appeal the PLB's decision elapsed before Lisek brought this action; therefore, the PLB's decision can no longer be challenged.

Rule 49 § 1(f) of the Rules and Rates of Pay for employees represented by the UTU requires NW to reinstate and to pay an employee for back pay if dismissal is found to be unjust. Lisek asserts NW's compliance with the PLB's decision was in direct violation of the UTU collective-bargaining agreement; however, as noted previously, interpretation of and compliance with the union contract is beyond the scope of the matters before this Court.

It is unclear whether Lisek is also implying that NW's refusal to pay his back wages is in some way racially motivated. I find no evidence, however, that NW paid lost wages to any nonwhite employee after the PLB directed NW to reinstate that employee without back pay.

### c. *Cobbs's Memo.*

Lisek asserts a confidential memo directed to Superintendent Patterson by Trainmaster R.D. Cobbs, an African–American, unfairly prejudiced NW against Lisek and illustrates NW's discriminatory employment practices.

Both Cobbs and Patterson testified Cobbs wrote the letter at the request of either Patterson or Salmons. The memo was written in late August or early September 1987 after Lisek's dismissal in preparation for NW's response to Lisek's complaint filed with the Illinois Department of Human Rights. Although the contents were certainly not favorable to Lisek, I find little in the letter that could not be deduced from a cursory reading of Lisek's personnel record. I also find nothing in the letter to indicate it was written with racially discriminatory motives.

### d. *Motive for NW's Racial Discrimination.*

Lisek contends NW disciplined nonwhites less severely than whites in an effort to avoid Title VII charges of discrimination by non-white employees.

Lisek notes that litigation is costly and time-consuming for any company. NW has the additional burden of showing the absence of discrimination in order to receive federal funding. As a result, Lisek asserts NW supervisors distributed harsher discipline to whites in order to preserve their jobs and to be considered for promotions. I find no evidence, either direct or indirect, to support these highly speculative allegations.

### ATTORNEYS' FEES AND COSTS

Under 42 U.S.C. § 2000e–5(k), a court may, in its discretion, "allow the prevailing party ... a reasonable attorney's fee (including expert fees) as part of the costs." NW has requested attorneys' fees and costs and, as a prevailing defendant, NW is permitted to petition for same subject to the requirements of *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

NW will have fourteen days from the entry of judgment to file its petition in accordance with Fed.R.Civ.P. 54(d)(2) and Local General Rule 46.

### CONCLUSION

In summary, I do not find that NW's disciplinary action was most likely motivated by a discriminatory reason or that NW's proffered explanations are unworthy of credence. I, therefore, hold Lisek has not satisfied his burden by persuading me that the legitimate, nondiscriminatory reasons for dismissing him as articulated by NW were a pretext for racial discrimination.

IT IS SO ORDERED.